IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:06-cv-00051-RSW-KKK |
| vs. | ) | |
| | ) | |
| INTERMEC, INC., INTERMEC | ) | |
| TECHNOLOGIES CORPORATION, and | ) | |
| INTERMEC IP CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**ALIEN TECHNOLOGY CORPORATION'S OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................................................. 1

II.  STATEMENT OF FACTS .................................................................................................... 1

    A.   The Parties ...................................................................................................................... 1

        1.   Plaintiff Alien ........................................................................................................ 1

        2.   The Intermec Defendants ...................................................................................... 2

    B.   Intermec's May 8, 2006 Earnings Conference Call ....................................................... 3

    C.   Intermec's Other Statements And Actions Regarding Enforcement Of Its Patents .......... 4

        1.   Patent Assertions Made In Connection With Standard Setting ............................ 4

        2.   Intermec's Repeated Attempts To License Alien ................................................. 5

        3.   Intermec's Filing and Threats of Filing RFID Patent Infringement
            Lawsuits ................................................................................................................ 6

    D.   Procedural Posture of The Current Litigation Between Alien and Intermec ................... 6

III. ARGUMENT ........................................................................................................................ 7

    A.   The Court Has Subject Matter Jurisdiction Over This Action Because There Is
        An Actual Controversy ................................................................................................... 7

        1.   Intermec Expressly Threatened Alien With An Infringement Suit ...................... 8

        2.   Alien Had A Reasonable Apprehension Of Suit Under The Totality Of
            The Circumstances .............................................................................................. 12

    B.   The Court Has Personal Jurisdiction Over All Of The Intermec Defendants ................. 16

        1.   ITC Is Subject To Personal Jurisdiction In North Dakota ................................. 17

            a.   ITC Is Licensed To Do Business In North Dakota ............................. 17

            b.   ITC Conducts A Substantial Amount Of Business In North
                  Dakota ................................................................................................ 19

        2.   Intermec, Inc. And IIP Are Subject To Personal Jurisdiction In North
            Dakota ................................................................................................................ 22

    C.   Alien's Complaint Satisfies Rule 8 .............................................................................. 25

IV.  CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*3M Innovative Properties Co. v. InFocus Corp.*,
No. Civ. 04-0009, 2005 WL 361494 (D. Minn. 2005)..........................................................20

*Applexion S.A. v. Amalgamated Sugar Co.*,
95 C 858, 1995 WL 229049 (N.D. Ill. Apr. 17, 1995)..........................................................9

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*,
846 F.2d 731 (Fed. Cir. 1988)..........................................................................................8, 12

*B & J Mfg. v. Solar Indus.*,
483 F.2d 594 (8th Cir. 1973)................................................................................................22

*Black & Veatch Const., Inc. v. ABB Power Generation, Inc.*,
123 F.Supp.2d 569 (D. Kan. 2000)......................................................................................21

*BP Chem.*, 4 F.3d 975 (Fed. Cir. 1993)....................................................................................15

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).......................................................................................................17, 20

*C.R. Bard, Inc. v. Schwartz*,
716 F.2d 874 (Fed. Cir. 1983).......................................................................................13, 14

*Cerner Corp. v. Visicu, Inc.*,
No. 04-1033, 2005 WL 2346987 (W.D. Mo. Sept. 26, 2005)................................................9

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
395 F.3d 1315 (Fed. Cir. 2005)............................................................................................16

*Cygnus Therapeutics Sys. v. ALZA Corp.*,
92 F.3d 1153 (Fed. Cir. 1996), *overruled on other grounds*,
141 F.3d 1059 (Fed. Cir. 1998).......................................................................................9, 10

*Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*,
142 F.3d 1266 (Fed. Cir. 1998).......................................................................................24, 25

*Dakcoll Inc. v. Grand Central Graphics, Inc.*,
352 F.Supp.2d 990 (D.N.D. 2005)........................................................................................16

*Delta Systems, Inc. v. Indak Mfg. Corp.*,
2001 WL 103518 (Fed. Cir. 2001).......................................................................................20

*DuPont Merck Pharm. Co. v. Bristol-Myers Squibb Co.*,
62 F.3d 1397 (Fed. Cir. 1995)..............................................................................................13

*Duratech Indus. Int'l, Inc. v. Bridgeview Mfg., Inc.*,
Case No. 3:05-CV-90-RSW (D.N.D. Apr. 21, 2006)...........................................................15

*Electronics for Imaging, Inc. v. Coyle*,
340 F.3d 1344 (Fed. Cir. 2003)............................................................................................17

*EMC Corp. v. Norand Corp.*,
89 F.3d 807 (Fed. Cir. 1996).........................................................................................7, 15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Filertek, Inc. v. Medex, Inc.,*
   No. 01C50034, 2002 WL 24039 (N.D. Ill. Jan. 8, 2002) ....................................................... 14

*Gen-Probe, Inc. v. Amoco Corp.,*
   926 F. Supp. 948 (S.D. Cal. 1996) ....................................................................................... 25

*Hanson v. Denckla,*
   357 U.S. 235 (1958) ............................................................................................................. 17

*Helicopteros Nacionales de Columbia, S.A. v. Hall,*
   466 U.S. 408 (1984) ....................................................................................................... 17, 22

*In re Dr. Reddy's Laboratories, Ltd.,*
   No. 01 Civ. 10102, 2002 WL 31059289 (S.D.N.Y. 2002) ............................................. 13, 14

*Interdigital Tech. Corp. v. Oki Am., Inc.,*
   845 F. Supp. 276 (E.D. Pa. 1994) ....................................................................................... 25

*International Shoe Co. v. Washington,*
   326 U.S. 310 (1945) ....................................................................................................... 20, 22

*Ivoclar Vivadent, Inc. v. Hasel & ABCO Research LLC,*
   No. 02cv0316, 2003 WL 21730520 (W.D.N.Y. June 30, 2003) ........................................... 15

*Korzyk v. Swank Entrprises, Inc,.*
   No. cv 04 343, 2005 WL 1378758 (E.D. Wash. 2005) ......................................................... 18

*Mastercard Int'l Inc. v. Lexcel Solutions, Inc.,*
   No. 03-Civ. 7157, 2004 WL 1368299 (S.D.N.Y. June 16, 2004) ........................................... 9

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.,*
   288 F.3d 1264 (11th Cir. 2002) ........................................................................................... 23

*Metropolitan Life Ins. Co. v. Robertson-Ceco Co.,*
   84 F.3d 560 (2d Cir. 1996) .................................................................................................. 18

*Microchip Technology Inc. v. Chamberlain Group, Inc.,*
   441 F.3d 936 (Fed. Cir. 2006) ............................................................................................... 7

*Micro-Mega S.A. v. Jacklich,*
   No. 84cv2943, 1985 WL 1246 (E.D.N.Y. Jan.4, 1985) ....................................................... 13

*Nippon Electric Glass Co. v. Sheldon,*
   489 F.Supp. 119 (S.D.N.Y.1980) ......................................................................................... 12

*Northwest Territory Ltd. Partnership v. OMNI Properties, Inc.,*
   2005 WL 3132350 (D.Minn. 2005) ...................................................................................... 22

*Ondeo Nalco Co. v. Eka Chems., Inc.,*
   No. Civ. A.01-337, 2002 WL 1458853 (D. Del. June 10, 2002) ........................................... 25

*Phillips Plastics Corp v. Kato Hatsujou Kabushiki Kaish.,*
   57 F.3d 1053 (1995) ............................................................................................................. 12

*Scott v. Canadian Nat. Ry. Co.,*
   No. 04-4758, 2006 WL 399692 (D. Minn. 2006) ................................................................. 19

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Scott v. Mego Int'l, Inc.,*
519 F.Supp. 1118 (D. Minn. 1981) ..................................................22, 23, 24

*Sigma Tau Industrie Farmaceutichue Riunite S.P .A. v. Lonza, Ltd.,*
36 F.Supp.2d 26 (D.D.C. 1999) ............................................................14

*Soma Medical Intern. v. Standard Chartered Bank,*
196 F.3d 1292 (10th Cir. 1999)............................................................22

*Stairmaster Sports/Medical Prods., Inc. v. Pacific Fitness Corp.,*
916 F. Supp. 1049 (W.D. Wash. 1994) ..................................................20

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ............................................................................10

*Super Products Corp. v. D.P. Way Corp.,*
546 F.2d 748 (7th Cir. 1976)..............................................................10

*Super Sack Mfg. Corp. v. Chase Packaging Corp.,*
57 F.3d 1054 (Fed. Cir. 1995) ............................................................16

*Technical Concepts, L.P. v. Zurn Industries, Inc.,*
No. 0262827, 2002 WL 31027962 (N.D. Ill. 2002) ..................................15

*Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.,*
395 F.3d 1324 (Fed. Cir. 2005) ..........................................................10

*West Interactive Corp. v. First Data Resources, Inc.,*
972 F.2d 1295 (Fed. Cir. 1992) ..........................................................13

*World-Wide Volkswagen Corp. v. Woodson,*
444 US. 286 (1980) ..........................................................................17

**State Cases**

*Ensign v. Bank of Baker,*
676 N.W.2d 786 (N.D. 2004) ..............................................................20

**Other Authorities**

28 U.S.C. § 1391(b)-(c)........................................................................25

Declaratory Judgment Act, 28 U.S.C. § 2201(a)...........................................7

**Federal Rules**

Federal Rule of Civil Procedure 30(b)(6).........................................3, 7, 20, 24

Federal Rule of Civil Procedure 8 .......................................................1, 25

**Other Authorities**

Donald S. Chisum, *Patents* § 21.02........................................................12

## I.    **INTRODUCTION**

In June 2006, plaintiff Alien Technology Corporation ("Alien") filed this action against

defendants Intermec, Inc., Intermec Technologies Corporation, and Intermec IP Corporation (collectively

"Intermec") seeking a declaration that ten of Intermec's patents related to radio frequency identification

("RFID") technology are invalid and not infringed by any Alien product.  Intermec has moved to dismiss

on three grounds: (i) the Court lacks subject matter jurisdiction because Alien did not have a reasonable

apprehension of suit when it filed this action; (ii) the Court lacks personal jurisdiction over all of the

Intermec defendants; and (iii) Alien's complaint does not comply with Federal Rule of Civil Procedure 8.

As shown below, each of Intermec's arguments is without merit.  Intermec's position is nothing

more than a ruse by Intermec to litigate this dispute in a forum which it believes will be more favorable to

it – the District of Delaware – and less favorable to Alien, which has a significant presence in North

Dakota through its manufacturing facility in Fargo.  Indeed, just weeks after Alien filed this action,

Intermec filed suit in Delaware asserting six of the same patents at issue here, plus four other closely

related patents.[1]  Accordingly, the Court should reject Intermec's arguments and deny its motion to

dismiss.

## II.    **STATEMENT OF FACTS**

### A.    **The Parties**

#### 1.    Plaintiff Alien

Plaintiff Alien, which is incorporated in Delaware and has its principal office in California,

manufactures and sells RFID products, including tags and readers.[2]  Declaration of Glenn Gengel

---

[1] Alien has moved to dismiss the Delaware action or to transfer it to this Court.  Declaration of Megan M. La Belle ("La Belle Decl."), ¶ 2.  From its opposition to Alien's motion to dismiss in the Delaware action, it is clear that Intermec chose to sue Alien on some different patents in order to make the argument that its case was first filed, at least with respect to some patents.

[2] RFID systems typically consist of at least one "tag," which can transmit information, and a "reader," which can receive a signal from the tag that contains information.  Gengel Decl., ¶ 2.  The tag is placed on an object, such as a piece of merchandise.  The information can identify the object to which the tag is

("Gengel Decl."), ¶¶ 2-3 . Since 2004, Alien has maintained a manufacturing facility in Fargo, North

Dakota, where the allegedly infringing products are manufactured. *Id.*, ¶ 4. In addition, Alien has

invested approximately $15 million in a new manufacturing facility located in the North Dakota State

University Research and Technology Park in Fargo. *Id.*, ¶ 5, Exh. A. Over the next two years, Alien

plans to invest several million dollars to further expand the facility and intends to employ approximately

100 people, including engineers and technicians. *Id.*

     2.    The Intermec Defendants

     Intermec consists of three interrelated companies – Intermec, Inc., Intermec Technologies

Corporation ("ITC"), and Intermec IP Corporation ("IIP") – which operate together as the U.S. arm of the

Intermec companies worldwide. Declaration of Sarah A. Herman ("Herman Decl."), ¶ 5, Exh. G at 55:3-

11. Intermec, Inc., the parent company, is incorporated in Delaware and has its principal place of

business in Everett, Washington. *See* Defendants' Memorandum in Support of their Motion to Dismiss

("MTD") at 3. Intermec, Inc. is a holding company that "does not make, sell or provide any product,

system or service." *Id.* at 13.

     ITC, a wholly-owned subsidiary of Intermec, Inc., is the operating company that manufactures

and sells RFID devices, among other products. *Id.* at 3. ITC is incorporated in Washington and, like

Intermec, Inc., is headquartered in Everett, Washington. IIP is a wholly-owned subsidiary of ITC that is

incorporated in Delaware and has its principal office in Henderson, Nevada. *Id.* IIP owns the patents at

issue in the instant action. *Id.*

     Although the three Intermec defendants are separately incorporated, they effectively operate as

one company. For example, the Intermec defendants share many of the same officers and directors. La

Belle Decl., ¶ 9, Exh. D. Moreover, although ITC manufactures and sells products covered by patents

owned by IIP, there is no license agreement between the companies. Herman Decl., ¶ 5, Exh. G at 58:20-

---

affixed. RFID devices may be used for inventory control, to identify animals, for credit cards or drivers'
licenses, or a myriad other uses. *Id.*

59:24, 66:22-68:7.  Indeed, ITC and Intermec, Inc. have made numerous public statements about

licensing and enforcing patents, even though the patents are actually owned by IIP.  Declaration of David

Aaron ("Aaron Decl."), Exhs. A, C-Q.  In this litigation, each of the Rule 30(b)(6) witnesses offered to

date has testified on behalf of all three Intermec defendants.  Herman Decl., ¶ 5, Exhs. E-G.  Finally, the

three companies issue consolidated financial statements, summaries of operation, and statements of

income, and they file consolidated tax returns.  *Id.*, ¶ 5, Exh. G at 36:16-37:2.

### B.    Intermec's May 8, 2006 Earnings Conference Call

On May 8, 2006, Intermec held its first quarter earnings release conference call with the public

and investment analysts.  Aaron Decl., ¶¶ 2, 3, Exh. A.  Four representatives of Intermec were present on

the call, including Steve Winter, a Senior Vice President of Intermec, Inc. and the President and Chief

Operating Officer of ITC.  During the question and answer portion of the call, an analyst asked:

> One question on RFID and royalty revenues on a go-forward basis.  You
> have a number of non-licensed companies out there selling products,
> some of which are winning large size contracts.  How long can you wait
> before needing to step in and enforce the Rapid Start program?

Mr. Winter responded as follows:

> Let me take the first part first, which had to do with enforcement of IP
> rights.  [¶] It's obviously disappointing if any customer were to do
> business with a supplier that is not licensed.  But you know, we have
> consistently stated we will be pursuing infringers.  We are putting
> together cases.  We are looking at those who are most disruptive to the
> industry right now.  And basically, preparations are underway with
> respect to unlicensed suppliers like Alien and others.  And we expect
> those enforcement actions by the end of the year, or within this year.

*Id.* at 12.

Shortly after learning of this statement by Mr. Winter, Alien filed the instant lawsuit.  When it

did, Intermec confirmed that Alien had rightly understood its May 8 statement as a threat.  Intermec said:

> Today's action by Alien Technology is not unexpected.  We continue to
> believe, as we stated during our last quarterly conference call on May 8,
> that Alien, among others, makes and sells products that infringe Intermec
> RFID patents.  We have consistently said we will pursue those
> companies that infringe our intellectual property patent estate.  We
> continue our due diligence related to these matters.

Aaron Decl., ¶ 5, Exh. B.

**C.**    **Intermec's Other Statements And Actions Regarding Enforcement Of Its Patents**

1.    Patent Assertions Made In Connection With Standard Setting

Many industries, including the RFID industry, have attempted to standardize their technology through private organizations known as standard-setting organizations ("SSOs"). EPCglobal and the International Organization for Standards ("ISO") are two SSOs involved in setting standards for RFID devices. Aaron Decl., ¶¶ 8, 14. To participate in EPCglobal and ISO, members must agree to disclose certain of their patent claims – those that are both believed to be "necessary" to implement the standards under development and for which they intend to pursue royalties (as opposed to allowing use of the patented technology on a royalty free basis). *Id.*, ¶ 8, fn. 2. To the extent a member intends to pursue royalties on its "necessary" patent claims, both EPCglobal and ISO require members to offer licenses on reasonable and non-discriminatory ("RAND") terms. *Id.*

In the 2004-2005 time frame, Intermec declared to EPCglobal and ISO its intent to enforce on RAND terms a total of eleven issued U.S. Patents against implementers of the standard(s).[3] *Id.*, ¶¶ 8-10, 14.[4] Months after Intermec submitted its final EPCglobal declaration on August 9, 2004, EPCglobal's outside counsel, the law firm of Dann Dorfman Herrell and Skillman, determined that Intermec's patents were not necessary to practice the standards for which they were declared. In response, Intermec "[withdrew] its previous commitment to license this intellectual property and to do so on RAND terms." *Id.*, ¶ 11, Exh. I. Further, Intermec issued a publication asserting that, despite the assessment by EPCglobal that its patents were not "absolutely required," any product made in accordance with the

---

[3] These patents are: U.S. Patent No. 4,739,328 ("the '328 patent"); U.S. Patent No. 5,030,807 ("the '807 patent"); U.S. Patent No. 5,777,561 ("the '561 patent"); U.S. Patent No. 5,828,693 ("the '693 patent"); U.S. Patent No. 5,850,181 ("the '181 patent"); U.S. Patent No. 5,912,632 patent ("the '632 patent"); U.S. Patent No. 5,995,019 ("the '019 patent"); U.S. Patent No. 6,429,775 ("the '775 patent"); U.S. Patent No. 6,288,629 ("the '629 patent"); U.S. Patent No. 6,812,841 ("the '841 patent"); and U.S. Patent No. 6,400,274 ("the '274 patent"). Aaron Decl., at 3-4, fn. 4, 6 and 7, fn.9.

[4] Alien's Complaint seeks declaratory judgments of invalidity and non-infringement of all of the patents listed in footnote 3, with the exception of the '328 patent which expired in July 2006.

standard without using its patents would be a "bare bones" product, devoid of "the features, functionality, reliability or cost profile customers are demanding." *Id.*, ¶ 12, Exh. J at 2, 3-4, 6.  In other words, Intermec contended that desirable features and/or functionality for RFID products could only be attained by using Intermec's patented technology.  *Id.*, ¶ 12; *see, e.g.*, Exh. J at 6 ("Every firm that wants to succeed in the RFID space will require IP licenses from Intermec").

In that same publication, Intermec threatened to pursue patent infringement claims against vendors and/or end users, telling end users to obtain "a representation and warranty that [RFID vendors, such as Alien] have obtained the Intermec licenses required for their RFID systems and an indemnity that ensures that your vendor will defend and hold you harmless from patent infringement claims.  If you can't get these assurances from the vendor [*e.g.*, Alien], then understand the risk that is being undertaken." *Id.*, ¶ 13, Exh. J at 6.

### 2.    Intermec's Repeated Attempts To License Alien

Consistent with its public proclamations about enforcing its patent rights against RFID manufacturers, and the need for such manufacturers to take a license from Intermec in order to produce marketable products, Intermec has made several attempts to license its patents to Alien.  First, in or about May 2004, the parties discussed a possible broad business relationship that would involve cross-licenses of intellectual property.  *Id.*, ¶ 15.  Next, in July 2004, Intermec sent Alien a letter outlining its then-current RFID intellectual property licensing program.  In this letter, Intermec asserted that a license to its patents would be necessary to manufacture and sell RFID products.  *Id.*, ¶ 16, Exh. M at 1.  And, finally, in May 2005, Intermec announced and publicized a licensing program called "Rapid Start," through which RFID vendors, such as Alien, could sign up for a broad license to Intermec's RFID and RFID-related patents.  *Id.*, ¶ 17.  Intermec sent Alien a letter, specifically offering its Rapid Start program to Alien.  In that letter, Intermec again contended that its patents were required to produce any marketable RFID products:

> It is the belief of most industry experts, expressed during the standards setting process, that a number of Intermec's patents, beyond those Intermec donated on a royalty free basis, will be required by RFID

> equipment manufacturers to implement the comprehensive set of
> performance requirements called out by the EPCglobal Business Action
> Group (BAG).

*Id.*, ¶ 18, Exh. P.[5]  Alien has not expressed any interest in joining any of Intermec's licensing programs.
*Id.*, ¶¶ 16, 18.

        3.       <ins>Intermec's Filing And Threats Of Filing RFID Patent Infringement Lawsuits</ins>

In the midst of the dispute with EPCglobal and its attempts to license Alien, Intermec took yet

another step in its pattern of vigorously enforcing its patents.  On June 6, 2004, IIP filed a patent

infringement suit asserting infringement of four RFID patents against Symbol Technologies Inc.

("Symbol" f/k/a Matrics, Inc.) – a manufacturer of RFID products that, like Alien, had refused to enter

into a license agreement with Intermec.  *Id.*, ¶ 19, Exh. Q.

Consistent with Intermec's pronouncements, on at least several occasions over the past few years,

Alien customers or potential customers have relayed to Alien incidents of Intermec representatives

accusing Alien products of infringement and threatening to sue Alien.  Declaration of Victor Vega ("Vega

Decl."), ¶¶ 3-6, Exh. A.  Furthermore, several news articles have been published in Korea recently

detailing Intermec's history of using strong-arm tactics with respect to its RFID patents.  La Belle Decl.,

¶ 14, Exhs. H-L.

**D.**     **<ins>Procedural Posture Of The Current Litigation Between Alien And Intermec</ins>**

In light of this history, and, in particular, Intermec's express threat of suit during the May 8, 2006

earnings conference call, on June 1, 2006, Alien filed this declaratory relief action.  By this action, Alien

is seeking declarations of non-infringement and invalidity of the ten unexpired patents Intermec has

declared as either "necessary" to practice the EPCglobal standard, or, if not "absolutely required," then at

least necessary to manufacture a product with the functions and features demanded by the RFID

marketplace.  *See* Aaron Decl., ¶ 10, Exh. H; *id.*, ¶ 12, Exh. J.

---

[5] The letter further stated that "[u]pon program closure, Intermec will continue as it has to protect the value of its intellectual property for the benefit of our shareholders, customers, employees, and licensees."
*Id.*, Exh. P.

Just weeks later, on June 29, 2006, IIP filed a patent infringement lawsuit in Delaware, contending that Alien infringes six of the ten patents asserted in this action, plus four additional patents.[6] La Belle Decl., ¶ 2, Exh. A.  On August 18, 2006, Alien filed a Motion to Dismiss or Stay, or, in the Alternative, Transfer the Delaware Action to North Dakota. *Id.*, ¶ 2.  IIP filed its opposition on October 2, 2006. *Id.*

The same day the Delaware Action was filed, Intermec moved to dismiss the current lawsuit. After the motion to dismiss was filed, the parties agreed to some limited discovery on the issue of personal jurisdiction, including the production of documents and a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).[7] La Belle Decl., ¶ 4.  Jurisdictional discovery is now complete, and Alien hereby submits its Opposition to Intermec's Motion to Dismiss.

## III.   ARGUMENT

### A.   The Court Has Subject Matter Jurisdiction Over This Action Because There Is An Actual Controversy

In order for a federal court to exercise jurisdiction over an action under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), there must be an actual controversy between the parties. *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 810 (Fed. Cir. 1996).[8]  Where a plaintiff seeks a declaration of patent non-infringement or invalidity, courts apply a two-part test to determine whether an actual controversy exists: (i) plaintiff must actually produce or be prepared to produce an allegedly infringing product; and (ii) the patentee's conduct must have created an "objectively reasonable apprehension on the part of the plaintiff

---

[6] The six patents at issue in both actions are the '561 patent, the '181 patent, the '632 patent, the '019 patent, the '274 patent, and the '841 patent.  The four new patents added to the Delaware action are the U.S. Patent No. 6,371,375 ("the '375 patent"), U.S. Patent No. 5,528,222 ("the '222 patent"), U.S. Patent No. 6,286,762 ("the '762 patent"), and U.S. Patent No. 6,812,852 ("the '852 patent"). La Belle Decl., ¶ 2, Exh. A.

[7] Alien also hoped to take some discovery on the issue of subject matter jurisdiction, but Intermec opposed, and Alien ultimately acceded to that position.  La Belle Decl., ¶ 4, Exh. C.

[8] Federal Circuit law governs the question "whether an actual controversy exists under the Declaratory Judgment Act when the underlying merits of an action involve patent infringement and/or validity." *Microchip Technology Inc. v. Chamberlain Group, Inc.*, 441 F.3d 936, 940 (Fed. Cir. 2006).

that the patentee will initiate suit if the activity in question continues." *Id.* at 811. Here, the first prong of

the test is satisfied because Alien produces RFID products that allegedly infringe Intermec's patents. La

Belle Decl., ¶ 2. Exh. A, ¶ 18. Intermec contends, however, that Alien cannot demonstrate a reasonable

apprehension of suit.

The "reasonable apprehension" prong of the test is satisfied by an express charge of infringement.

"If defendant has expressly charged a current activity of the plaintiff as an infringement, there is clearly

an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more."

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988). In the absence

of an express threat, the court must consider the totality of the circumstances to determine if defendant's

conduct created an objectively reasonable apprehension of suit. *Id.*

     1.    <u>Intermec Expressly Threatened Alien With An Infringement Suit</u>

During the May 8, 2006 earnings call, Intermec threatened to sue Alien for patent infringement.

As set forth above, Steve Winter, a Senior Vice President of Intermec, Inc. and the President and COO of

ITC, stated the following in response to an analyst's question about what Intermec planned to do about

competitors that had not joined its Rapid Start licensing program:

> It's obviously disappointing if any customer were to do business with a
> supplier that is not licensed. But you know, we have consistently stated
> *we will be pursuing infringers. We are putting together cases.* We are
> looking at those who are most disruptive to the industry right now. *And*
> *basically, preparations are underway with respect to unlicensed*
> *suppliers like Alien and others. And we expect those enforcement*
> *actions by the end of the year, or within this year.*

Aaron Decl., Exh. A (emphasis added). Thus, Intermec publicly announced that it was going to sue Alien

for patent infringement no later than December 2006.

On its face, Mr. Winter's statement that Intermec is "pursuing infringers," "putting together

cases," and preparing to bring actions against "unlicensed suppliers like Alien" "by the end of the year,"

constitutes an express charge of infringement that created in Alien a reasonable apprehension of suit.

This is confirmed by the case law, which makes clear that the reasonable apprehension test is satisfied by

statements much less direct than Mr. Winter's. *See Arrowhead*, 846 F.2d at 733, 737 (finding actual

controversy based on patent holder's letter to Arrowhead's customer stating that Arrowhead "is not licensed to use our process and we would therefore consider any use a direct patent infringement" because "by citing Arrowhead and only Arrowhead, and saying Arrowhead is not licensed, [the letter] produced an apprehension of litigation"); *Cerner Corp. v. Visicu, Inc.*, No. 04-1033, 2005 WL 2346987, *7 (W.D. Mo. Sept. 26, 2005) (statement that patent holder "intends 'to protect its interests' by 'actively policing the market' and 'aggressively pursuing infringers'" is sufficient to create objectively reasonable apprehension of suit); *Mastercard Int'l Inc. v. Lexcel Solutions, Inc.*, No. 03-Civ. 7157, 2004 WL 1368299, *1, 4 (S.D.N.Y. June 16, 2004) (finding an express charge of infringement where defendant warned "that it may pursue a patent infringement suit against MasterCard for past or future conduct, and cite[d] to 'powerful evidence' of its patents' validity"); *Applexion S.A. v. Amalgamated Sugar Co.*, 95 C 858, 1995 WL 229049, *1 (N.D. Ill. Apr. 17, 1995) (holding that Amalgamated's statement that it "has reason to suspect that the Applexion process infringes Amalgamated's patent" was an express charge of infringement).

Notwithstanding this clear and controlling case law, Intermec relies on *Cygnus Therapeutics Sys. v. ALZA Corp.*, 92 F.3d 1153 (Fed. Cir. 1996), *overruled on other grounds*, 141 F.3d 1059 (Fed. Cir. 1998), to argue that Mr. Winter's statement was insufficient to give rise to reasonable apprehension of suit. MTD at 8-9. However, far from presenting a "remarkably similar situation," MTD at 8, *Cygnus* is inapposite.

As here, in *Cygnus*, the statement at issue was one made at an investor conference. However, unlike here, the statement at issue did not mention "putting together cases" in "pursu[it] [of] infringers." Nor did it specifically identify an accused infringer and indicate that preparations to file suit were underway against that accused infringer. It did not come close. All that occurred in *Cygnus* was a prediction by the CEO (Mr. Gerstel) that competitors would not enter the market with infringing products, because the patents had been proven to be strong:

> They won't market the products because we're not going to give them licenses and the patents are valid. In many cases, they've already been challenged and have been upheld. And our policy will be that we have

> spent a great deal of money developing this technology and we have a
> very strong proprietary position.

*Id.* at 1156. This statement is nothing more than a comment on the strength of the company's intellectual property. Indeed, as the *Cygnus* court concluded, "[i]t is difficult to imagine a businessman in Mr. Gerstel's position – when asked about his company's policy with respect to enforcement of its patents at a meeting attended by institutional investors – responding any differently than Mr. Gerstel did to the question from the audience." *Id.* at 1160.

Intermec crossed that line. Mr. Winter did not merely say that Intermec's patent portfolio is strong, or even that he would expect "unlicensed suppliers, like Alien" to take licenses due to that strength. Rather, he made a direct and unambiguous statement about initiating patent litigation against "unlicensed suppliers, like Alien." Thus, contrary to Intermec's assertions, *Cygnus* does not stand for the broad proposition that "statements of a patentee, reassuring investors that it will enforce its patent portfolio, cannot give rise to a reasonable apprehension of suit on the part of an unlicensed company." MTD at 8. *Cygnus* simply held that Mr. Gerstel's statement, which was very different than Mr. Winter's statement, was not sufficient to create a reasonable apprehension of suit. *Cygnus*, 92 F.3d at 1160. *Cf. Super Products Corp. v. D.P. Way Corp.*, 546 F.2d 748 (7th Cir. 1976) (finding a reasonable apprehension of suit based on defendant's announcement to prospective investors that it was determined to defend its patent rights).

Intermec also asserts that Mr. Winter's statement is insufficient to create a reasonable apprehension because, at best, it referenced Intermec's Rule 11 investigation of a lawsuit against Alien, not a lawsuit to be filed immediately. MTD at 7-8. This argument, too, lacks merit.

First, while it is true that the risk of an infringement suit must be "imminent," that does not mean that Intermec had to be "on the verge of filing a patent-infringement action against Alien." *Id.* Rather, as the Federal Circuit recently explained, "[t]his requirement of imminence reflects the Article III mandate that the injury in fact be 'concrete,' and 'actual or imminent, not conjectural or hypothetical.'" *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir. 2005) (quoting *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). Here, the "injury" to Intermec's patent rights certainly was not conjectural or hypothetical – Intermec had made it crystal clear that Alien was an "unlicensed supplier" against whom it was preparing to seek recovery of its patent damages by way of a patent infringement lawsuit. Indeed, even before Intermec expressly threatened to sue Alien during the May 2006 earnings call, its conduct demonstrated that an actual controversy existed between the parties. For example, as discussed above, and in greater detail below, Intermec had (i) repeatedly taken the position that RFID devices could not be marketed without using the ten patents at issue in this case; (ii) repeatedly offered Alien a license of those and other of its patents; (iii) threatened Alien's customers with lawsuits for patent infringement; and (iv) sued another RFID manufacturer for patent infringement. *See generally*, Aaron Decl.; Vega Decl., ¶¶ 3-6, Exh. A. Thus, under the standard articulated in *Teva*, Intermec's actions clearly satisfied the imminence requirement.

Second, Mr. Winter's statement made during the May 8 call is properly understood as a direct threat to file suit against Alien. Indeed, when it was not yet concerned with trying to move this action out of North Dakota, Intermec admitted as much. Hours after Alien filed this lawsuit, Intermec released the following statement to the press:

> Today's action by Alien Technology is not unexpected. We continue to believe, *as we stated during our last quarterly conference call on May 8*, that Alien, among others, makes and sells products that infringe Intermec RFID patents.

Aaron Decl., Exh. B (emphasis added). In other words, Intermec confirmed that, during the May 8 earnings call, it had accused Alien of *actual* infringement and not merely *potential* infringement as it now claims.

Third, Intermec's assertion that an infringement suit was not imminent is belied by the fact that, four weeks after Alien filed this declaratory relief action, IIP sued Alien for patent infringement. La Belle Decl., ¶ 2, Exh. A. Intermec's proposition – *i.e.*, that on June 1 Intermec had no intention of suing Alien, but by June 29 it had examined its extensive patent portfolio of over 140 patents to select the patents it might pursue against Alien, obtained Alien's products, conducted a full examination of those products to

determine which patents to pursue, and prepared an infringement analysis of Alien's products against (at least ten) of its patents – defies logic.

For these reasons, the Court should find that Mr. Winter's statements during the May 8, 2006 earnings call constituted an express charge of infringement sufficient to create in Alien a reasonable apprehension of suit.[9]

### 2. Alien Had A Reasonable Apprehension Of Suit Under The Totality Of The Circumstances

Even if Mr. Winter's statement is not considered an express charge of infringement, under the totality of the circumstances, Intermec's conduct created an objectively reasonable apprehension of suit. Courts must evaluate the totality of the circumstances because a party "should not be subject to manipulation by a patentee who uses careful phrases in order to avoid explicit threats." *Phillips Plastics Corp v. Kato Hatsujou Kabushiki Kaish.*, 57 F.3d 1053 (1995). Some of the factors courts consider are: (1) general announcements to the industry in trade papers; (2) threats or statements to customers; (3) suits against customers; (4) suits against others (*i.e.*, competitors) involving the same patents; (5) a history of litigation between the parties; (6) an opinion by counsel for the patent owner; (7) assertions made during license negotiations; and (8) suits abroad on analogous foreign patents. *See* Donald S. Chisum, *Patents* § 21.02. Several of these factors are present in this case.

First, Intermec made statements in connection with EPCglobal and ISO that gave rise to a reasonable apprehension of suit. As discussed above, Intermec declared a number of patents as necessary to implement the standard, meaning anyone that manufactured RFID products implementing the standard would be infringing several Intermec patents. Aaron Decl., ¶¶ 8-10. Moreover, even after EPCglobal's

---

[9] Intermec suggests that a reasonable apprehension of suit cannot be based on the statements during the May 8 earnings call because Alien failed to show "any contact between it and any of the Intermec Defendants regarding the patents-in-suit." MTD at 9. It is axiomatic, however, that "a reasonable apprehension may be found in the absence of *any* communication from defendant to plaintiff." *Arrowhead*, 846 F.2d at 736 (emphasis in original); *see also Nippon Electric Glass Co. v. Sheldon,* 489 F.Supp. 119, 121 (S.D.N.Y.1980) ("The accusation [of infringement] need not be made directly to the declaratory judgment plaintiff, but may be made to its customers or the industry at large.").

outside counsel determined that the patents were not in fact necessary, Intermec continued to claim that its intellectual property was required to manufacture "marketable" RFID products, *i.e.*, products with the features and functionality that customers desire. *Id.*, ¶¶ 11-12.  To that end, Intermec warned end users that they should obtain "a representation and warranty that [RFID vendors, such as Alien] have obtained the Intermec licenses required for their RFID systems and an indemnity that ensures that your vendor will defend and hold you harmless from patent infringement claims.  ***If you can't get these assurances from the vendor [e.g., Alien], then understand the risk that is being undertaken.***"  *Id.*, ¶ 13, Exh. J. at 6 (emphasis added).

Where, as here, the defendant has threatened the entire industry, courts find that a reasonable apprehension of suit exists.  As explained in *In re Dr. Reddy's Laboratories, Ltd.*:

> It is true that the comments made by aaiPharma regarding potential infringement suits were directed at generic omeprazole manufacturers as a whole and not DRL specifically.  For purposes of DRL's reasonable apprehension that it would be subject to an infringement suit, however, this is a distinction without a difference: ***threats of infringement suits against an entire product industry can create reasonable apprehension among all individual members of that industry.***

No. 01 Civ. 10102, 2002 WL 31059289, *7 (S.D.N.Y. 2002) (emphasis added); *see also DuPont Merck Pharm. Co. v. Bristol-Myers Squibb Co.*, 62 F.3d 1397, 1401 (Fed. Cir. 1995) (finding reasonable apprehension based in part on defendant's threat to bring patent infringement suits against generic drug manufacturers who attempt to market their products during the twenty-year period after the patent was first filed); *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 n6 (Fed. Cir. 1983) (listing notice of infringement in trade journals as a factor in favor of finding a reasonable apprehension of suit); *Micro-Mega S.A. v. Jacklich*, No. 84cv2943, 1985 WL 1246, at *3 (E.D.N.Y. Jan.4, 1985) ("For example, if the patentee has threatened to sue for infringement the plaintiff's customers or warned the industry to which plaintiff belongs of patentee's rights, both situations have been held to be sufficient.").

Second, in June 2004, IIP filed a patent infringement suit against another RFID manufacturer for infringement of, *inter alia*, the '632 patent and '019 patent, both of which are at issue in this case.  Aaron Decl., ¶ 19, Exh. Q.  It is well settled that suits against competitors involving the same or related patents

weigh in favor of finding a reasonable apprehension. *See, e.g.*, *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1298 (Fed. Cir. 1992) ("[A] patent owner's willingness and capacity to enforce its patent rights is pertinent to the inquiry for an actual controversy."); *C.R. Bard*, 716 F.2d at 881 n.6 (including "lawsuits against other manufacturers of similar products" as factor in finding a reasonable apprehension of infringement); *Filertek, Inc. v. Medex, Inc.*, No. 01C50034, 2002 WL 24039, *1 (N.D. Ill. Jan. 8, 2002) (patent holder's previous infringement suit against competitor was factor in favor of reasonable apprehension).

Third, Intermec has made statements to Alien's actual or potential customers accusing Alien products of infringement and threatening to sue Alien. Vega Decl., ¶¶ 3-6, Exh. A. This conduct, too, is the type that creates a reasonable apprehension of suit. *C.R. Bard*, 716 F.2d at 881 (stating that courts have relied on actual or threatened suits against customers in finding a reasonable apprehension of suit); *Sigma Tau Industrie Farmaceutichue Riunite S.P .A. v. Lonza, Ltd.*, 36 F.Supp.2d 26, 30 n. 5 (D.D.C. 1999) ("The threat of infringement does not have to be directed against plaintiffs specifically. It is sufficient to create a reasonable apprehension if plaintiffs' customers, or other competitors, are threatened.").

Fourth, Intermec has made statements to the press and/or public that gave rise to Alien's reasonable apprehension of suit. For example, Intermec has made several announcements to the Korean RFID industry recently about how it intends to enforce its patents, not only against allegedly infringing manufacturers like Alien, but against resellers and end users of those manufacturers' products as well. La Belle Decl., ¶ 14, Exhs. H-L. The articles explain that, in or around July 2005, Intermec sent letters to several companies in Korea trying to "persuade" them to join the Rapid Start licensing program. *Id.*, ¶ 14, Exh. K. This was understood by the RFID industry as a "gesture of intimidation." *Id.*, ¶ 14, Exh. L. Moreover, when a prominent Korean vendor of RFID systems joined Intermec's licensing program, members of the RFID community believed that "Intermec is mounting a patent offensive" and that "Intermec's exercise of its [intellectual property rights] is perhaps imminent." *Id.*, ¶ 14, Exh I. As explained above, "threats of infringement suits against an entire product industry can create reasonable

- 14 -

apprehension among all individual members of that industry." *Dr. Reddy's,* 2002 WL 31059289, at *7.

Fifth, Intermec's conduct in connection with its repeated attempts to get Alien to enter into a license agreement also created a reasonable apprehension of suit.  In July 2004 and May 2005, Intermec tried to persuade Alien to join its licensing program by asserting that its patents were necessary to manufacture and sell RFID products.  Aaron Decl., ¶¶ 16-18.  In addition, Intermec warned Alien that, "[u]pon program closure, Intermec will continue as it has to protect the value of its intellectual property for the benefit of our shareholders, customers, employees, and licensees." *Id.,* Exh. P.  In other words, Intermec was threatening to sue Alien if it did not join the program, which is sufficient to create a justiciable controversy. *See, e.g., Norand,* 89 F.3d at 811 (reasonable apprehension exists where a patent holder threatens an infringement action if plaintiff fails to take a license); *Duratech Indus. Int'l, Inc. v. Bridgeview Mfg., Inc.,* Case No. 3:05-CV-90-RSW (D.N.D. Apr. 21, 2006) ("An objective person in Duratech's position could only conclude that Bridgeview had already decided that Duratech was infringing its patents and that Bridgeview intended to bring suit unless Duratech gave into its license demands."); *Ivoclar Vivadent, Inc. v. Hasel & ABCO Research LLC,* No. 02cv0316, 2003 WL 21730520, *4-5 (W.D.N.Y. June 30, 2003) (finding reasonable apprehension based on letter from defendant ABCO stating that "(1) several of [plaintiff's] marketed products "may infringe" ABCO patents, (2) ABCO had pursued patent infringement litigation for nearly two years against another alleged infringer…and (3) it "will be enforcing [its] patents against other infringers.").

Finally, Intermec's actions since this declaratory relief action was filed confirm that Alien had a reasonable apprehension of suit. *See Technical Concepts, L.P. v. Zurn Industries, Inc.,* No. 0262827, 2002 WL 31027962, *5 (N.D. Ill. 2002) (citing *BP Chem. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 980 (Fed. Cir. 1993), for the proposition that "subsequent events can reinforce the correctness of the conclusion that an actual controversy existed").  For example, less than a month after Alien filed the instant action, Intermec sued it for patent infringement.  La Belle Decl., ¶ 2, Exh. A.  Perhaps even more revealing, hours after Alien's lawsuit was filed, Intermec made the following statement to the media:

- 15-

> Today's action by Alien Technology *is not unexpected*. We continue to believe, *as we stated during our last quarterly conference call on May 8, that Alien, among others, makes and sells products that infringe Intermec RFID patents. We have consistently said we will pursue those companies that infringe our intellectual property patent estate*. We continue our due diligence related to these matters.

Aaron Decl., Exh. B (emphasis added). This statement raises many questions about Intermec's current position that Alien had no reasonable apprehension of suit: If Intermec had not created a reasonable expectation of suit, then why did Intermec's spokesperson say that Alien's lawsuit was "not unexpected"? And, if Intermec admits that it said on May 8 that Alien "makes and sells products that infringe Intermec RFID patents" and has consistently promised to pursue infringers, then how can Intermec maintain that Alien had no reasonable apprehension of suit when it filed the complaint on June 1, 2006?

The answer to these questions is simple. There was an actual dispute between Intermec and Alien at the time this declaratory relief action was filed, and Intermec admitted as much within hours of its filing. Now that Intermec wants this dispute to be resolved in its forum of choice (*i.e.*, the District of Delaware), not here in North Dakota, it is distorting history and ignoring reality. As the overwhelming evidence shows, Intermec expressly threatened Alien during the May 8 earnings call and engaged in a course of conduct prior and subsequent thereto that easily satisfies the reasonable apprehension test.[10]

## B.   The Court Has Personal Jurisdiction Over All Of The Intermec Defendants

The Intermec Defendants contend that they are not subject to suit in North Dakota. In order to establish personal jurisdiction in a patent infringement case, a plaintiff must show both that the state long-

---

[10] On June 29, 2006, the day it filed this motion to dismiss and the Delaware action, Intermec sent a letter to Alien stating that IIP "does not presently intend to file a lawsuit" against Alien with respect to the four patents in this case that were not asserted in the Delaware action, *i.e.*, the '807, '693, '629, and '775 patents. La Belle Decl., ¶ 3, Exh. B. Presumably, the purpose of that letter was to try to eliminate Alien's reasonable apprehension as to those four patents. It is true that "a patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case" by filing a covenant not to sue. *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995). In order for such a covenant to be effective, however, it must extend to all past, present, and future acts of the alleged infringer. *Id.* Thus, Intermec's statement that it does not "presently intend" to sue Alien on the four identified patents, does not constitute a covenant not to sue and has no impact on the reasonable apprehension analysis.

arm statute applies and that the requirements of due process are satisfied. *See Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1319 (Fed. Cir. 2005). Under the North Dakota long-arm statute, this Court is authorized to exercise jurisdiction to the fullest extent allowed by due process. *Dakcoll Inc. v. Grand Central Graphics, Inc.*, 352 F.Supp.2d 990, 994 (D.N.D. 2005). Due process requires that there be sufficient minimum contacts between the defendant and the forum state such that the "maintenance of the suit does not offend the traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 US. 286, 291-92 (1980) (internal quotations omitted).

Where, as here, plaintiff alleges that general jurisdiction exists, the Court may hear this lawsuit if Intermec has "continuous and systematic [general business] contacts" with North Dakota, even if the injuries at issue in the lawsuit do not arise out of Intermec's activities directed at the forum. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). In addition, Intermec must have purposefully availed itself of the privilege of conducting activities within North Dakota, "thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

1.    ITC Is Subject To Personal Jurisdiction In North Dakota

Intermec avers that "ITC is not subject to general jurisdiction in North Dakota because its contacts with North Dakota are, at best, random, sporadic and attenuated." MTD at 13. It bases this argument on the following: (1) ITC is not located in North Dakota; (2) it is not licensed to do business in North Dakota; (3) it has no offices or employees in North Dakota; and (4) less than $270,000 or 0.0571% of ITC's sales in 2005 were to customers in North Dakota. *Id.* at 13-14. This argument should be rejected on both legal and factual grounds.

It is well settled that a physical presence in the forum state is not required for personal jurisdiction. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985) ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."); *Electronics for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1351 (Fed. Cir. 2003).

Rather, the question is whether ITC's contacts with North Dakota are continuous and systematic such that it should reasonably anticipate being haled into court in this forum. *World-Wide Volkswagen*, 444 US. at 297. Based on the facts uncovered during discovery, the answer to that question is a resounding "yes."

a.      ITC Is Licensed To Do Business In North Dakota

In his declaration in support of Intermec's motion to dismiss, Kenneth Cohen, a Vice President and the Treasurer of all three Intermec defendants, and one of the individuals selected by all three Intermec defendants as their corporate representative on the issue of business conducted in North Dakota, stated that ITC "does not have a license to do business in the State of North Dakota." Declaration of David S. Becker In Support of Defendants' Motion to Dismiss, Exh. B, ¶ 26. Mr. Cohen reaffirmed this statement at his 30(b)(6) deposition on September 29, 2006. Herman Decl., ¶ 5, Exh. G at 25;18-26:3. Mr. Cohen explained that the decision whether to obtain a license to transact business in a given state is within his purview, and that Intermec obtains such a license when it has a "significant nexus" with and a "presence" in the state. *Id.*, ¶ 5, Exh. G at 26:4-28:20. Mr. Cohen further testified that ITC has a license to do business in about 48 of the 50 states, but not in North Dakota. *Id.*, ¶ 5, Exh. G at 28:21-25.

Mr. Cohen's testimony that ITC is not licensed to do business in North Dakota is flat out wrong. On or about June 26, 2006, Alien obtained from the North Dakota Secretary of State a Certificate of Good Standing, which provides that ITC has been authorized to transact business in North Dakota since July 1, 1999. *Id.*, ¶ 2, Exh. A. Mr. Cohen testified that this is the type of documentation received when a company is licensed to do business in a state. *Id.*, ¶ 5, Exh. G at 26:4-12; 69:7-11; La Belle Decl., ¶ 11 Exh. F. Thus, despite Intermec's repeated assertions to the contrary, ITC is in fact licensed to do business in North Dakota and has been for the past seven years.[11] Courts have held that evidence that a defendant

---

[11] In addition, ITC filed a Foreign Corporation Application in North Dakota in 1999, which stated that ITC intended to conduct the following business in North Dakota: "Sales of machines or devices used in or related to all lawful activities incidental to data communications." Herman Decl., ¶ B, Ex. 2 at 1. Since 1999, ITC has filed a Foreign Corporation Annual Report in North Dakota every year, including in 2006. *Id.*, ¶ 2, Ex. B. In those annual reports, ITC indicated that the business activities in which it was actually engaged included "development, manufacture, and sale of machines or devices used in or related to

- 18-

has a license to conduct business in the forum state is a factor in favor of finding the requisite minimum contacts. *See, e.g.*, *Metropolitan Life Ins. Co. v. Robertson-Ceco Co.*, 84 F.3d 560, 570-71 (2d Cir. 1996); *Korzyk v. Swank Entrprises, Inc,*. No. cv 04 343, 2005 WL 1378758, *11 (E.D. Wash. 2005). More importantly, Intermec's own witness testified that ITC only obtains such a license when it has a "significant nexus" with and a "presence" in the forum state. Thus, based on Mr. Cohen's testimony alone, it is clear that ITC is subject to personal jurisdiction in North Dakota. Nevertheless, as detailed below, ITC has other significant contacts with North Dakota that make the question of personal jurisdiction an easy one for the Court to resolve.

> b.    ITC Conducts A Substantial Amount Of Business In North Dakota

Contrary to what Intermec claims, ITC conducts a substantial amount of business in North Dakota. Although Intermec says that less than $270,000 or 0.0571% of ITC's sales in FY 2005 were to customers in North Dakota, that data is unreliable for several reasons. First, in maintaining that ITC made only $270,000 in sales to North Dakota companies in 2005, Intermec relies on and cites to Mr. Cohen's declaration. MTD at 14. During his deposition, however, Mr. Cohen admitted that he had no personal knowledge of the basis for this figure. Herman Decl., ¶ 5, Exh. G at 30:6-33:13. According to Mr. Cohen, he was "given the numbers" by someone, perhaps from accounting, but does not know anything about how this number was calculated. *Id.* Because this information is not based on Mr. Cohen's personal knowledge, it should be disregarded by the Court. Federal Rule of Evidence 602; *see also, e.g.*, *Scott v. Canadian Nat. Ry. Co.*, No. 04-4758, 2006 WL 399692, *5 (D. Minn. 2006).

Even if the Court were to consider the $270,000 figure for FY 2005 despite its lack of evidentiary support, that figure is not probative of ITC's actual sales in North Dakota. The $270,000 figure accounts only for Intermec's direct sales in North Dakota, not its indirect sales. During discovery on Intermec's motion, ITC admitted that it in sells its products in three ways: (1) direct sales; (2) indirect sales through

---

computer and data communications." *Id.* Finally, ITC has designated an agent for service of process in North Dakota. *Id.*, ¶ 3, Exh. C.

partners or "resellers"; and (3) indirect sales through distributors. Herman Decl., ¶ 5, Exh. F at 18:19-19:9; La Belle Decl., ¶ 10, Exh. E. Moreover, Intermec admitted that at least 50% of ITC's sales are made through resellers and distributors, Herman Decl., ¶ 5, Exh. E at 75:14-21; Exh. F at 19:10-20-13, and that the invoices produced by Intermec did not reflect any sales made to North Dakota through such "indirect" channels. *Id.*, ¶ 5, Exh. F at 13:12-24:18, 32:16-33:14, 41:7-42:25; La Belle Decl., ¶ 7. Intermec's 30(b)(6) witnesses testified that ITC's resellers and distributors sell nationwide, including to North Dakota, so additional ITC products are likely present in that forum. Herman Decl., ¶ 5, Exh. F at 32:16-33:5, 37:25-38:5.[12] Thus, the $270,000 likely under-represents, potentially significantly, the sales of ITC products that have been made in North Dakota.

Third, while the defendant's percentage of sales in the forum state can be relevant to the jurisdictional analysis, the Supreme Court has rejected any rigid test for determining personal jurisdiction. *Burger King,* 471 U.S. at 478. The "criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative," rather, the Court must examine "the quality and nature of the activity." *International Shoe Co. v. Washington*, 326 U.S. 310, 159-160 (1945). Here, the invoices produced by Intermec (which, as noted above, even if the Court agrees to consider them, reflect only direct sales to North Dakota) indicate that ITC has sold goods and services to *more than 100* companies and governmental entities in North Dakota over the past five years, totaling approximately *$2.1 million*. La Belle Decl., ¶ 7; Herman Decl., ¶ 5, Exh. F at 24:19-25:9. In a state with a small population like North Dakota, that is a substantial amount of business. *See, e.g., 3M Innovative Properties Co. v. InFocus Corp.*, No. Civ. 04-0009, 2005

---

[12] In addition to the increased sales from resellers and distributors, Intermec has testified that ITC sells its products to many nationwide stores like Home Depot, WalMart, and PepsiCo. Herman Decl., ¶ 5, Exh. F at 47:13-50:17. Sales to those companies would be invoiced to the forum in which the company was headquartered even though many of the products will end up in chains in other states, like North Dakota. *Id.*, ¶ 5, Exh. F at 52:4-53:10, 85:20-86:23, 92:17-93:20, 108:12-109:25. For example, the invoices that the Intermec Defendants produced did not indicate any sales to Home Depot in North Dakota. Independent evidence reflects, however, that Home Depot stores, including the one located in Fargo, North Dakota, use ITC products. *Id.*, ¶ 5, Exh. F at 102:2-103:1; Gengel Decl., ¶ 6, Exh. B.

WL 361494, *3 (D. Minn. 2005) ("[T]he fact that the defendant's revenues from sales in the forum state amount to only a small percentage of that defendant's total sales does not render the actual dollar amount of the sales insignificant for personal jurisdiction purposes.") (citing *Delta Systems, Inc. v. Indak Mfg. Corp.*, 2001 WL 103518, *3 (Fed. Cir. 2001)).[13]

In addition to sales made to North Dakota companies, ITC conducts other business here as well. In particular, in or about September 2002, ITC entered into an agreement with Microsoft Business Solutions ("MBS"), which is headquartered in Fargo and is one of the largest companies in North Dakota. Herman Decl., ¶ 5, Exh. E at 12: 9-13:3, 30:22-31:13; La Belle Decl., ¶ 12, Exh. G. Pursuant to that agreement, ITC and MBS formed an "alliance" that was intended to help ITC sell its products and services to MBS's partners and customers. Herman Decl. ¶ 5, Exh. E at 27:23-31:13; La Belle Decl., ¶ 12, Exh. G. Intermec's website prominently displays this alliance with MBS and includes substantial information about the various products and services offered in connection with that alliance. La Belle Decl., ¶ 12, Exh. G. And while Intermec now contends that the alliance with MBS was unsuccessful and is no longer being pursued, the fact is that ITC purposefully availed itself of the protections of North Dakota by entering into a business arrangement with a significant company in that state. *See Black & Veatch Const., Inc. v. ABB Power Generation, Inc.*, 123 F.Supp.2d 569, 576 (D. Kan. 2000) (holding that defendant was subject to personal jurisdiction in Kansas in part because it entered into an agreement with Kansas company Black & Veatch "with full knowledge that Black & Veatch has its principle place of business in Kansas, and that it would perform a substantial amount of the contract in Kansas"). Indeed, even today, ITC continues to broadcast the alliance with MBS on its website, presumably because of the

---

[13] The cases cited by Intermec are easily distinguished. In *Ensign v. Bank of Baker*, 676 N.W.2d 786, 791 (N.D. 2004), the court found that the defendant bank was not subject to general jurisdiction because "the Bank occasionally loans money to North Dakota customers, it does not solicit customers in North Dakota, and the loans are originated in Montana." Here, by contrast, Intermec regularly sells its products to the 100 or more customers it has in North Dakota. Similarly, in *Stairmaster Sports/Medical Prods., Inc. v. Pacific Fitness Corp.*, 916 F. Supp. 1049, 1053 (W.D. Wash. 1994), the court held that defendant was not subject to general jurisdiction because, unlike Intermec, it did not make any direct sales into the forum state.

goodwill generated by the Microsoft brand name, or perhaps because the alliance is actually still ongoing.[14] La Belle Decl., ¶ 12, Exh. G.

Finally, the evidence also demonstrates that, over the past five years, numerous employees of ITC have traveled to North Dakota. La Belle Decl., ¶ 8; Herman Decl., ¶ 5, Exh. E at 23:24-24-16, 25:25-26:8 & Exh. F at 43:1-19. Many of these individuals made repeated trips to North Dakota where they would spend days in the forum servicing customers, nurturing customer relationships, and attempting to generate additional business. *Id.*, ¶ 5, Exh. F at 76:5-77:1, 79:6-80:1; La Belle Decl., ¶ 8. These types of contacts support a finding of personal jurisdiction. *See International Shoe*, 326 U.S. at 159; *Soma Medical Intern. v. Standard Chartered Bank*, 196 F.3d 1292, 1296 (10th Cir. 1999); *Northwest Territory Ltd. Partnership v. OMNI Properties, Inc.*, 2005 WL 3132350, *4 (D.Minn. 2005).

Considering the totality of the circumstances – ITC's license to do business in North Dakota, its direct and indirect sales to North Dakota, its relationship with MBS, and its employees' multiple business trips to North Dakota – it is clear that ITC's contacts in the aggregate are the type of continuous and systematic contacts sufficient to subject it to general jurisdiction in North Dakota. *Helicopteros*, 466 U.S. at 420. Furthermore, the assertion of personal jurisdiction in this case comports with "traditional notions of fair play and substantial justice" because North Dakota "most certainly has an interest in providing a forum for a resident [Alien] who claims that a foreign corporation is attempting to prevent it from manufacturing and marketing its product." *B & J Mfg. v. Solar Indus.*, 483 F.2d 594, 598-99 (8th Cir. 1973). Accordingly, the Court should deny ITC's motion to dismiss for lack of personal jurisdiction.

2.  <u>Intermec, Inc. And IIP Are Subject To Personal Jurisdiction In North Dakota</u>

Intermec asserts that the Court lacks personal jurisdiction over Intermec, Inc. because it is a

---

[14] During his deposition, Intermec's witness Jeff Johnson testified that information regarding the MBS alliance was still on the website because Intermec had not updated the website recently. Herman Decl., ¶ 5, Exh. E at 15:13-16:1. However, Alien has searched the Intermec website and it appears to be updated on a regular basis. La Belle Decl., ¶ 13. By way of example, Intermec posts its quarterly SEC filings as well as recent press releases, including a press release on June 29, 2006 announcing the filing of the Delaware Action. *Id.*, ¶ 13.

holding company that "does not make, sell or provide any product, system or service to anyone, let alone residents of State of North Dakota." MTD at 13.  Intermec similarly argues that IIP is not subject to personal jurisdiction in North Dakota because it does not conduct any business in this forum.  *Id.* at 12. However, based on ITC's contacts with North Dakota and the close relationship between the three Intermec defendants, Intermec, Inc. and IIP are both subject to jurisdiction in North Dakota as well.

With respect to Intermec, Inc., a parent corporation may subject itself to jurisdiction by virtue of its subsidiary's activities in that forum if "the companies [are organized and are] operated so that one corporation is an instrumentality or adjunct of the other corporation." *Scott v. Mego Int'l, Inc.,* 519 F.Supp. 1118, 1125-26 (D. Minn. 1981).  In other words, if the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the subsidiary's business will be viewed as that of the parent and the latter will be said to be doing business in the jurisdiction through the subsidiary for purposes of asserting "personal jurisdiction." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1268-69 (11th Cir. 2002).  In deciding whether the subsidiary is a "mere instrumentality," courts consider several factors, such as whether the companies maintain offices at the same location, share directors and officers, issue consolidated financial statements, and file consolidated tax returns. *Mego,* 519 F. Supp. at 1126.

In this case, the evidence makes clear that the Intermec defendants actually operate as one company despite their separate incorporation.  Intermec, Inc. and ITC both have their headquarters in the same location in Everett, Washington, and there is significant overlap in the officers and directors of the three companies.  La Belle Decl., ¶ 9, Exh. D.  Mr. Cohen, for example, is the Treasurer for all three of the Intermec defendants, while Mr. Anderson is a Vice President, Controller, and Acting Chief Financial Officer of Intermec, Inc., a director and Vice President of ITC, and a director of IIP.  *Id.*  There is just one Intermec website (www.Intermec.com), and it identifies ITC as a "division" of Intermec, connoting a single company.  Further, when one clicks on the "corporate information" or "investor information" links of the Intermec website, she is directed to a single page with information about Intermec, Inc.  *Id.,* ¶¶ 12-

13. Indeed, in this case, all of the Rule 30(b)(6) witnesses offered by the defendants to date have testified on behalf of all three Intermec defendants. Herman Decl., ¶ 5, Exhs. E-G. In fact, there is so much overlap between these companies that Intermec itself appears to be confused. In their motion to dismiss, Intermec identifies Steve Winter as the President and COO of Intermec, Inc., MTD at 7, when Mr. Winter is actually the President and COO of ITC. La Belle Decl., ¶ 9, Exh. D. Moreover, Intermec posted a press release on its website announcing the lawsuit filed against Alien in Delaware, which states that the lawsuit was filed by Intermec, Inc. even though it was actually filed by IIP. *Id.*, ¶ 13.

In addition, Mr. Cohen testified that the three companies issue consolidated financials, summaries of operations, and statements of income, and they file consolidated tax returns. Herman Decl., ¶ 5, Exh. G at 36:16-37:2. He further testified that, although ITC manufactures and sells products covered by IIP's patents, ITC does not need to have (and thus, does not have) any licenses from IIP because the companies are "related." *Id.*, ¶ 5, Exh. G at 58:20-59:24, 66:22-68:7. Indeed, there are many examples in the record where Intermec, Inc. or ITC discuss RFID patents, offer to license those patents, and threaten to enforce patent rights even though IIP is the only entity of the three that has any ownership rights with respect to the patents. Aaron Decl., Exhs. A, C-Q. Moreover, there are instances when representatives of Intermec, Inc. talk about products and services, for example during the May 8 earnings call, even though Intermec, Inc. is a holding company that does not manufacture or sell any products. Aaron Decl., Exh. A. In short, because of the nature of the relationship among the Intermec defendants, the parent Intermec, Inc., is subject to personal jurisdiction in North Dakota based on the activities of its wholly-owned subsidiary in that forum. *See Mego*, 519 F. Supp. at 1126.

IIP, a wholly-owned subsidiary of ITC that owns the patents in suit, is subject to personal jurisdiction in North Dakota under *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1271 (Fed. Cir. 1998). In that case, plaintiff Dainippon filed a declaratory relief action against defendants CMF Technologies, Inc. ("CMF") and CMFT, Inc. ("CMFT"). CMF was the operating company and a competitor of Dainippon, while CMFT was a wholly-owned subsidiary of CMF and the owner of the patents at issue. *Id.* at 1267. Like here, the CMF defendants moved to dismiss for lack of personal

jurisdiction. The district court found that CMF was subject to jurisdiction but that CMFT was not, and then dismissed the entire action because CFMT, as the owner of the patents, was a necessary and indispensable party. *Id.* at 1266.

The Federal Circuit reversed and held that, based on the parent-subsidiary relationship between CFM and CFMT, it was "reasonable and fair" to subject CFMT to personal jurisdiction. The court explained:

> Stripped to its essentials, CFM contends that a parent company can incorporate a holding company in another state, transfer its patents to the holding company, arrange to have those patents licensed back to itself by virtue of its complete control over the holding company, and threaten its competitors with infringement without fear of being a declaratory judgment defendant, save perhaps in the state of incorporation of the holding company. This argument qualifies for one of our "chutzpah" awards. While a patent holding subsidiary is a legitimate creature and may provide certain business advantages, it cannot fairly be used to insulate patent owners from defending declaratory judgment actions in those fora where its parent company operates under the patent and engages in activities sufficient to create personal jurisdiction and declaratory judgment jurisdiction.

*Id.* at 1271. [internal citations omitted.] For these reasons, IIP is subject to personal jurisdiction in North Dakota too.[15]

### C.    Alien's Complaint Satisfies Rule 8

Intermec's final argument is that the complaint should be dismissed because Alien failed to satisfy Federal Rule of Civil Procedure 8 by not "identify[ing] specific products that are non-infringing." MTD at 15-16. Under Rule 8, however, "[p]laintiff need not identify, in the complaint, specific products by name, so long as they are sufficiently identified in some way." *Interdigital Tech. Corp. v. Oki Am., Inc.*, 845 F. Supp. 276, 283 (E.D. Pa. 1994). Here, Alien identified the non-infringing products as its "RFID tags and readers." *See, e.g.*, First Amended Complaint, ¶ 21. This is sufficient to put Intermec on notice of the products at issue. Indeed, in the Delaware action filed less than a month after the instant

---

[15] Because all of the Intermec Defendants are subject to personal jurisdiction in North Dakota, venue is also proper in this district. 28 U.S.C. § 1391(b)-(c).

suit, Intermec was able to identify specific Alien products it believes are infringing.  La Belle Decl., ¶ 2,

Exh. A, ¶ 18.  In any event, even if Alien's complaint was deficient (which it is not), the cases make clear

that any dismissal shall be with leave to amend.  *See Ondeo Nalco Co. v. Eka Chems., Inc.*, No. Civ.

A.01-337, 2002 WL 1458853, *2 (D. Del. June 10, 2002); *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp.

948, 964 (S.D. Cal. 1996).

## IV.    CONCLUSION

For the foregoing reasons, Alien respectfully requests that the Court deny Intermec's motion to

dismiss on all grounds.

Respectfully Submitted,

Dated:  October 13, 2006

/s/ Sarah Andrews Herman
Sarah Andrews Herman
Bar Number 03399
DORSEY & WHITNEY LLP
51 North Broadway, Suite 402
P.O. Box 1344
Fargo, ND 58107-1344
Telephone:  (701) 235-6000
Fax:  (701) 235-9969

and

Gregory P. Stone
Andrea Weiss Jeffries
Megan M. La Belle
MUNGER TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9100
Fax:  (213) 687-3701

ATTORNEYS FOR PLAINTIFF ALIEN
TECHNOLOGY CORPORATION