IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:06-CV-51-RSW-KKK |
| v. | ) ) ) | |
| INTERMEC, INC., a Delaware corporation, INTERMEC TECHNOLOGIES CORP., a Washington corporation, and INTERMEC IP CORP., a Delaware corporation, | ) ) ) ) ) | Judge Rodney S. Webb  Magistrate Judge Karen K. Klein |
| Defendants. | ) ) | |

**DEFENDANTS' REPLY IN SUPPORT
OF THEIR MOTION TO DISMISS**

## TABLE OF AUTHORITIES

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................3

A. NO ACTUAL CASE IN CONTROVERSY EXISTED AT THE TIME ALIEN FILED ITS
   COMPLAINT. ...............................................................................................................3

   1. NO EXPRESS THREAT OF SUIT WAS EVER MADE BY ANY OF THE INTERMEC
      DEFENDANTS. .........................................................................................................3

     *Arrowhead Indus. Water, Inc. v. Ecololab, Inc.,*
         846 F.2d 731 (Fed. Cir. 1988)................................................................ passim

     *Cerner Corp. v. Visicu, Inc.,*
         No. 04-1033, 2005 WL 2346987, at *1 (W.D. Mo. Sept. 26, 2005) ..............................5

     *Mastercard Int'l. Inc. v. Lexcel Solutions, Inc.,*
         No. 03 Civ. 7157 (WHP), 2004 WL 1368299, at *1 (S.D.N.Y. June 16, 2004) ..........5

     *Applexion S.A. v. Amalgamated Sugar Co.,*
         No. 95 C 858, 1995 WL 229049, at *1 (N.D. Ill. April 17, 1995) ...............................5

     *Cygnus Therapeutics Systems v. Alza Corp.,*
         92 F.3d 1153 (Fed. Cir. 1996)................................................................................6

     *Shell Oil Co. v. Amoco Corp,*
         970 F.2d 885 (Fed. Cir. 1992)................................................................................7

     *West Interactive Corp. v. First Data Resources, Inc.,*
         972 F.2d 1295 (Fed. Cir. 1992)................................................................7, 10, 14

   2. VIEWING THE TOTALITY OF THE CIRCUMSTANCES, ALIEN COULD NOT HAVE
      HAS AN OBJECTIVELY REASONABLE APPREHENSION OF SUIT. ...........................................7

     *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.,*
         395 F.3d 1324 (Fed. Cir. 1995)................................................................................8

     *Indium Corp. of America v. Semi-Alloys, Inc.,*
         781 F.2d 879 (Fed. Cir. 1985)................................................................................10, 12

     *Murphy v. Missouri Dept. of Corrections,*
         372 F.3d 979 (8th Cir. 2004) ................................................................................10

*BP Chems. v. Union Carbide Corp.,*
    4 F.3d 975 (Fed. Cir. 1993)..................................................................10

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,*
    57 F.3d 1051 (Fed. Cir. 1995).........................................................11, 12

*EMC v. Norand Corp.,*
    89 F.3d 807 (Fed. Cir. 1996)..................................................................13

*Duratech Indus. Int'l, Inc. v. Bridgeview Mfg., Inc.,*
    Case No. 3:05-CV-90-RSW (D.N.D. Apr. 21, 2006)..................................13

*Ivoclar Vivadent, Inc. v. Hasel & ABCO Research LLC,*
    No. 02cv0316, 2003 WL 21730520, at *1 (W.D.N.Y. June 30, 2003) .....................13

**B. THE INTERMEC DEFENDANTS' CONTACTS WITH NORTH DAKOTA ARE INSUFFICIENT TO SUBJECT THEM TO PERSONAL JURISDICTION THERE.** ...........14

    **1. ALIEN CANNOT IGNORE CORPORATE FORMALITIES IN ITS EFFORT TO CONVINCE THIS COURT TO EXERCISE PERSONAL JURISDICTION OVER INTERMEC AND IIP.** ...........14

*Walker v. Newgent,*
    583 F.2d 163 (5th Cir. 1978) ..................................................................15

*Canon Mfg. Co. v. Cudahy Packing Co.,*
    267 U.S. 333 (1925)..........................................................................15, 16

*Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.,*
    142 F.3d 1266 (Fed. Cir. 1998)................................................................15

*Epps v. Stewart Info. Svcs. Corp.,*
    327 F.3d 642 (8th Cir. 2003) ..................................................................17

*Steinke v. Safeco Ins. Co.,*
    270 F. Supp. 2d 1196 (D. Mont. 2003)......................................................17

    **2. EVEN ASSUMING THIS COURT IMPUTES ITC'S CONTACT WITH THIS FORUM ON INTERMEC AND IIP, THOSE CONTACTS ARE INADEQUATE TO ALLOW THE EXERCISE OF PERSONAL JURISDICTION OVER ANY OF THE INTERMEC DEFENDANTS.** ...........................................................................17

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)..........................................................................18, 19

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)..........................................................................19, 22

*Ensign v. Bank of Baker*,
  676 N.W.2d 786 (N.D. 2004) ...................................................................19, 24

*Stairmaster Sports/Medical Prods., Inc. v. Pacific Fitness Corp.*,
  916 F. Supp. 1049 (W.D. Wash. 1994), *aff'd* 78 F.3d 602 (Fed. Cir. 1996)..........19, 24

*McGill Tech. Ltd. v. Gourmet Tech., Inc., et al.*,
  300 F. Supp. 2d 501 (E.D. Mich. 2004)...................................................19, 24

*Hockerson-Halberstadt, Inc. v. Propet USA, Inc.*,
  62 Fed. Appx. 322 (Fed. Cir. 2003) ...........................................................20

*3M Innovative Properties Co. v. InFocus Corp.*,
  No.Civ.04-0009 JNE/JGL, 2005 WL 361494, at *1 (D. Minn. Feb. 9, 2005) ............20

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996).......................................................................20

*Korzyk v. Swank Enterprises, Inc.*,
  No CV-04-343-AAM, 2005 WL 1378758 (E.D. Wash. June 9, 2005) .......................20

**a.  Sales by independent resellers cannot be a basis for personal jurisdiction
     over ITC.**.....................................................................................21

*Jennings v. AC Hydraulic A/S*,
  383 F.3d 546 (7th Cir. 2004) ...................................................................21

*Bridgeport Music, Inc. v. Still N The Water Pub.*,
  327 F.2d 472 (6th Cir. 2003) ...................................................................21

*Boit v. Gar-Tec Prod., Inc.*,
  967 F.2d 671 (1st Cir. 1992) ...................................................................21

*Falkirk Mining Co. v. Japan Steel Works, Ltd.*,
  906 F.2d 369 (8th Cir. 1990) ...................................................................22

**b.  ITC's Former Relationship with Microsoft Business Solutions is
     Irrelevant.** .................................................................................24

*Black & Veatch Const., Inc. v. ABB Generation, Inc.*,
  123 F. Supp. 2d 569 (D. Kan 2000) ...........................................................24

**C.  SINCE ALIEN'S COMPLAINT FAILED TO IDENTIFY SPECIFIC PRODUCTS THAT
   ALIEN BELIEVES ARE ACCUSED OF HAVING INFRINGED IIP'S PATENTS, ALIEN'S
   COMPLAINT MUST BE DISMISSED PURSUANT TO RULE 8(A).** ............................25**

## INTRODUCTION

In response to the Intermec Defendant's Motion to Dismiss, Alien has filed a lengthy brief with hundreds of pages of affidavits and attached exhibits. None of the legal arguments Alien makes nor any of the supporting materials it relies on – which largely consist of irrelevant material and/or hearsay statements – support a conclusion that this Court has subject matter jurisdiction over this case, personal jurisdiction over the Defendants or that Alien has complied with FED.R.CIV.P. 8(a).

Alien has failed to meet its burden of proving that this Court has subject matter jurisdiction. In this regard, Alien has not shown that Intermec, Inc. ("Intermec"), Intermec Technologies Corp. ("ITC"), or Intermec IP Corp. ("IIP") (collectively "Intermec Defendants") ever made an express threat to sue Alien or identified any Alien product as infringing any Intermec patent. Alien has also failed to present facts that would support a finding that, prior to the day it filed this suit, there existed a totality of circumstances which gave it a legally cognizable, objectively reasonable apprehension of suit.

Instead, Alien has submitted affidavits that contain hearsay heaped upon hearsay for the proposition that years ago some unidentified Intermec representative may have told a potential customer of Alien that Intermec intended to sue Alien. Ironically, the same affidavits show Alien didn't believe the hearsay when it heard it in 2004. And, of course, it was not Intermec that sued years after these alleged statements were made, but Alien. Alien also relies on translations, commissioned by one of Alien's lawyers, of articles written in Korean and intended for a Korean audience (all hearsay, of course) that discuss whether Intermec's Korean patents are being infringed by Korean companies in Korea. Moreover, Alien's submission shows that these articles were found on the Internet by Alien's lawyers four months *after* this suit was filed and

could not possibly have been the basis of a pre-filing apprehension.   Likewise, the other "evidence" that Alien relies on, documents relating to Intermec's legal participation in standard-setting activities and two letters to Alien inviting them to discuss licensing, contain no accusations of infringement and no threats to sue anyone, let alone Alien.

Alien has also failed to meet its burden of proving that this Court has personal jurisdiction over the Intermec Defendants.   Indeed, Alien concedes that personal jurisdiction does not exist over Intermec and IIP (the owner of the patents and a necessary party) in any traditional sense, since neither company has any contacts with North Dakota.   Alien attempts to establish that it is possible to find jurisdiction over Intermec and IIP by examining the relationship of ITC, an affiliated company that sells a minimal amount of product into North Dakota, and IIP and Intermec.   However, Alien ignores the fact that IIP and Intermec are separate corporate entities from ITC, who along with IIP and Intermec observe all corporate formalities, have separate officers and directors and their own bank accounts.   Alien also ignores the fact that ITC does not have sufficient contacts with North Dakota to be subject to general personal jurisdiction there in any case.

Finally, Alien makes no real attempt to counter the Intermec Defendants contention that the Complaint should be dismissed for failure to comply with FED.R.CIV.P. 8(a).   In fact, Alien states that if the Court determines that it has failed to comply with the rule it should be allowed to replead.   That would be entirely futile since the facts required to establish subject matter and personal jurisdiction do not exist.

For all the above reasons and those detailed below, Alien's Complaint should be dismissed.

2

## ARGUMENT

### A. NO ACTUAL CASE IN CONTROVERSY EXISTED AT THE TIME ALIEN FILED ITS COMPLAINT.

#### 1. NO EXPRESS THREAT OF SUIT WAS EVER MADE BY ANY OF THE INTERMEC DEFENDANTS.

In its response brief, Alien makes the contention that Steve Winter's statements during the May 8, 2006 conference call amount to an express threat of suit.[1]  Of course, in an effort to make such a contention Alien has been forced to completely ignore the contemporaneous statements made by Larry Brady, Intermec's Chairman, CEO and Mr. Winter's boss. Immediately after Mr. Winter's statement, Mr. Brady said:

> I think given the circumstances that we are currently looking at – that is, the amazing propensity of people to take business well below cost, and the amazing publicity which such actions receive – that we are apt to move in advance of where we would have originally intended.  And indeed, the limitation on when we will take action now is more related to just the [wickets] that we have to go through – that is, [get the] product, and disassemble the product and understand that infringement is occurring.  Because we've got a certain obligation, before we can just go out and willy nilly start filing lawsuits, to demonstrate that there's a cause of action.  So that is the path that we are currently on.

Earnings Call Tr. at p. 16.  Thus, as expressed by the top corporate officer, Intermec had work to do to determine who, if anyone, was infringing its intellectual property and what could legally be done about it.  In fact, Mr. Brady never says Intermec is going to actually sue anyone, let alone Alien.

---

[1] Mr. Winter stated in response to a question from an investor:

> It's obviously disappointing if any customer were to do business with a supplier that is not licensed.  But you know, we have consistently stated we will be pursuing infringers.  We are putting together cases.  We are looking at those who are most disruptive to the industry right now.  And basically, preparations are underway with respect to unlicensed suppliers like Alien and others.  And we expect those enforcement actions by the end of the year, or within this year.

Transcript of the Intermec, Inc. Earnings Conference Call, Dated May 8, 2006 ("Earnings Call Tr."), attached to the Declaration of David S. Becker ("Becker Decl.") as Exhibit C at p. 12.

Indeed, even taken alone and out of context as Alien proposes, Mr. Winter's statement can not be viewed as an express threat. Distilled to its essence, all that Mr. Winter said is that Intermec was "putting together cases" and "looking at those who are most disruptive in the market." These statements made clear that Mr. Winter, just as Mr. Brady later clarified, believed that there was still work to be done before Intermec could be sure it could bring a suit against anyone. While Mr. Winter explained that Intermec was "looking at" "Alien and others," his statement was conditional. Contrary to Alien's assertion, Mr. Winter did not say that Intermec had determined that Alien was, in fact, infringing any IIP patent. Nor did he say that Intermec would initiate a suit if Alien was infringing. What he said was that Intermec is "looking at those who are most disruptive to the industry right now. And basically, preparations are underway with respect to unlicensed suppliers like Alien and others." Pursuing infringers doesn't automatically require a lawsuit—it might simply involve contacting them to negotiate a license or to persuade them to stop infringing without recourse to legal action or through the threat of it. Likewise, preparations in relation to unlicensed suppliers don't have to be for the initiation of a lawsuit—they could be for a negotiation.

The case law cited by Alien does not support the proposition that Mr. Winter's statements can be considered in a vacuum or that his statement alone could create an objectively reasonable apprehension of suit. *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, did not reach a holding based solely on a single statement and was not decided based on the existence of an express threat of suit. 846 F.2d 731 (Fed. Cir. 1988). That case was a **second** declaratory judgment complaint filed by plaintiff after the defendant had obtained dismissal of a previous complaint. *Id.* at 734, 738. The *Arrowhead* court ultimately determined that the plaintiff had an objectively reasonable apprehension of suit because the defendant sent letters both directly to the

4

plaintiff and to the plaintiff's customer in which it specifically identified a single patent which it believed was being infringed. *Id.* at 737-8. The court also based its holding on the fact that there was correspondence between the parties on the issue and that the correspondence made clear that Arrowhead believed infringement had occurred and identified exactly how the infringement had occurred. *Id.* Even more importantly, in related litigation in another court, defendants had stated that plaintiff "practice[d] the invention in suit . . . a process that infringes the patent in suit." *Id.* at 734.

The statements made by the defendant in *Arrowhead* are significantly more direct than the conditional statements made in a public forum here, and the case involved a history of litigation between the same parties regarding the same patents. Accordingly, *Arrowhead* does not support a finding of subject matter jurisdiction here. Nor do any of the other cases cited by Alien. *See Cerner Corp. v. Visicu, Inc.*, No. 04-1033, 2005 WL 2346987 (W.D. Mo. Sept. 26, 2005) (defendant sent a letter directly to plaintiff stating that defendant had a specific patent, had reviewed plaintiff's product offerings, had specific remedies available to it in litigation and that it thought plaintiff should get an opinion of counsel); *Mastercard Int'l. Inc. v. Lexcel Solutions, Inc.*, No. 03 Civ. 7157 (WHP), 2004 WL 1368299 (S.D.N.Y. June 16, 2004) (parties were already involved in related litigation and defendant sent a letter to plaintiff citing both past and future infringement, stating that it would consider plaintiff's infringement willful and identifying evidence of the patent's validity); *Applexion S.A. v. Amalgamated Sugar Co.*, No. 95 C 858, 1995 WL 229049 (N.D. Ill. April 17, 1995) (defendant sent letter to plaintiff accusing defendant of "infringing most if not each of Claim 1-15 of the '866 patent.")

None of Alien's cited cases involve statements remotely analogous to the statements made at the May 8th earnings call. All of these cases involved direct accusation from the

defendant to the plaintiff either in writing or in person. All of them identify the product at issue and the precise patent being infringed. Two of the cases involved parties that had already engaged in litigation with each other either involving the same patent or a relationship that implicated use of the patent. And, all of the cases involved ongoing discussions between the parties regarding the issue of infringement. No such facts exist here. At the time Alien filed its suit, Alien and the Intermec Defendants apparently had not had any communication for more than a year. And, the only evidence Alien presents regarding any communication between the parties are two letters from Intermec to Alien inviting Alien to participate in a discussion about a licensing program. Those letters do not make any specific or general statement about infringement, mention any specific patents, discuss specific products, or, most importantly, threaten suit. *See infra* at § A.2.

Alien incorrectly asserts that *Cygnus Therapeutics Systems v. Alza Corp.*, 92 F.3d 1153 (Fed. Cir. 1996), actually supports its position. This is a mischaracterization of the holding in that case. Putting aside Alien's mischaracterization, the *Cygnus* court held that statements made by a corporate officer in the context of a discussion with investors must be taken in context and it is only reasonable that a patentee would confirm to its investors that it is fully informed of developments in the market place and provide assurance of its plan to defend its intellectual property position. *See Cygnus*, 92 F.3d at 1159-60. Intermec is a publicly-traded company whose subsidiary IIP's patent portfolio bolsters the strength and innovation of ITC's products and provides revenue in the form of license payments. It would be irresponsible for its officers, when asked directly how long it can wait before enforcing its rights, to say anything other than it is in the process of evaluating whether infringement has occurred and that it will take whatever action it thinks appropriate (which doesn't automatically mean filing a lawsuit) once such a

6

determination has been reached.  Intermec made no express threat and it crossed no "line" that would justify Alien filing the lawsuit it did.  Intermec simply made a general statement about the fact that it will, where warranted, take unspecified action in the future.  Such a statement has long been recognized by the law as not being an express threat of suit.  *See Shell Oil Co. v. Amoco Corp*, 970 F.2d 885, 889 (Fed. Cir. 1992) (statement that declaratory-judgment plaintiff's activities "fall within" defendant's patent claims insufficient to create reasonable apprehension of suit).

Finally, Alien ignores the basic principal that an objectively reasonable apprehension of suit must be based solely on the facts known to plaintiff prior to filing suit.  *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1297 (Fed. Cir. 1992); *Arrowhead Indus. Water, Inc.*, 846 F.2d at 734 n. 2 (excluding defendant's post-filing letter to plaintiff's customer from the analysis because "the presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed").  In its brief, Alien references a statement made by an Intermec spokesperson after Alien filed suit as a basis for Alien's alleged pre-filing objectively reasonable apprehension.[2]  However, in the context of subject matter jurisdiction in this case, the statement, which isn't a threat anyway, is simply irrelevant because it was made *after* Alien needed to have formed its objectively reasonable apprehension of suit.

---

[2] After Alien filed the present action, Intermec released a statement which said:

> Today's action by Alien Technology is not unexpected.  We continue to believe, as we stated during our last quarterly conference call on May 8, that Alien, among others, makes and sells products that infringe Intermec RFID patents.  We have consistently said we will pursue those companies that infringe our intellectual property patent estate.  We continue our due diligence related to these matters.

2. **VIEWING THE TOTALITY OF THE CIRCUMSTANCES, ALIEN COULD NOT HAVE HAD AN OBJECTIVELY REASONABLE APPREHENSION OF SUIT.**

Apparently knowing that it does not have the factual basis for a legitimate claim of subject matter jurisdiction based on an "express threat," Alien goes to extensive lengths to cobble together a totality-of-the-circumstances theory upon which it hopes subject matter jurisdiction might be based. Alien completely fails. Alien's declarations and voluminous exhibits – fraught with factual misstatements and hearsay as they are – do nothing to change the fact that the Intermec Defendants have never taken any actions, viewed individually or collectively, that could give rise to an objectively reasonable apprehension of suit on Alien's part.

First, Alien, without any legal support, argues that ITC's participation in the EPC Global and ISO standard-setting processes gave Alien an objectively reasonable apprehension of suit. ITC's actions in this regard cannot give rise to such an apprehension. *See Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324 (Fed. Cir. 1995) (rejecting as a basis for an apprehension of suit a declaratory-judgment defendant's declaration of patents as part of compliance with FDA regulations). In *Teva*, plaintiff argued that Pfizer's listing of its patent in the Orange Book – a disclosure requirement imposed by the Hatch-Waxman Amendments which relate to FDA approval of prescription drugs – was the basis for its objectively reasonable apprehension of suit. The court stated that, since the listing was made pursuant to an outside agency's requirement of disclosure, the "listing requirement should not be construed as a blanket threat to potential infringers." *Id.* at 1333. The Court noted that the Pfizer's listing merely indicated that "claims of infringement 'could be reasonably asserted,'" and held that "[m]ore is required for an actual controversy than the existence of an adversely held patent." *Id.*

ITC's participation in the industry-wide standard-setting processes of EPC Global and ISO is closely analogous to the Hatch-Waxman procedure discussed in *Teva*.  EPC Global and ISO are independent entities that have established procedures for participation in their standard-setting processes and require certain participating holders of related intellectual property to declare all patents which the patentee believes contain "Necessary Claims" or "claims that would be necessarily infringed by implementing the Specification."  *See* EPC Global - Standards Development Process ("EPC Standards"), attached to Declaration of Matthew J. Kramer ("Kramer Decl.") as Exhibit A, at p. 64, Appendix 2, ¶ 1.7.  In accordance with the EPC Standards, Intermec disclosed certain patents it then believed contained Necessary Claims. Exhibits C, D, E, F, G, and H to the Declaration of David Aaron ("Aaron Decl.") are precisely the declarations required by EPC Global and are in the form outlined by the EPC Standards in Appendix 7.  As the Court held in *Teva*, such required declarations should not be viewed as a blanket threat to sue.  Such declarations create a more open exchange of information and encourage legal, industry-wide collaboration.  This open exchange promotes innovation that would otherwise be chilled if each company had to speak more guardedly about their intellectual property or refrain from participation in the standard-setting process for fear of losing the value of its intellectual property.  This industry participation on the part of Intermec – which did not involve any assertion by Intermec that any company's products infringed any particular Intermec patents or any threat by Intermec to sue anyone, let alone Alien – cannot be used as a basis for subject matter jurisdiction in this case.

Second, Alien claims an apprehension of suit based on the fact that in 2004 Intermec IP sued another company, Matrics (which was purchased by Symbol Technologies, Inc. during the pendency of the suit), for infringement of one of the patents Alien has chosen to include in this

case. However, as Alien well knows, the Matrics suit involved a predecessor to the technology at issue in this case (Gen 1 vs Gen 2) and did not involve the issue of whether *Alien's* Gen 2 readers and tags infringed any Intermec patents.  Kramer Decl. at ¶ 3.  The law is clear that, under circumstances such as these, a company's previous lawsuit against another party cannot be the basis of an objectively reasonable apprehension of suit by someone in Alien's position.  *See West Interactive Corp.*, 972 F.2d at 1298 (prior actions against others insufficient to give reasonable apprehension of suit); *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed. Cir. 1985) (same).

Third, Alien has had one of its employees, a Victor Vega, file an affidavit which it claims supports a finding that in 2004 someone at Intermec indicated to a potential Alien customer that Intermec intended to sue Alien.  Not surprisingly, the declaration of Victor Vega contains no admissible evidence.  Rule 56(e), by its own terms, requires that affidavits "shall be made on personal knowledge such as would be admissible in evidence."  *See also Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 982 (8th Cir. 2004).  Mr. Vega's declaration only contains hearsay and double hearsay.  *See generally* Declaration of Victor Vega ("Vega Decl.").  He claims that, in 2004, a potential Alien customer told Mr. Vega that an unidentified "Intermec representative" told the potential customer that "Intermec indicated that it was going to pursue a patent infringement action against Alien."  Vega Decl. at ¶ 4.  This statement is a classic example of double hearsay and cannot be considered by this Court as supporting the proposition that Intermec actually made any threat of suit.  Even if Alien were to claim that this double hearsay is merely being used to show Alien's state of mind, and this Court chose to consider the statement in that context, this purported statement is no basis for an ***objectively reasonable*** apprehension of suit.  *See BP Chems. v. Union Carbide Corp.*, 4 F.3d 975, 979 (Fed. Cir. 1993) ("a subjective

10

apprehension is insufficient without objective substance"). By June 2006 – two years later – no suit had been filed by Intermec. The fact that no suit was ever brought is a strong indication that any 2006 apprehension on Alien's part, based on a 2004 double-hearsay statement, could not have been objectively reasonable.

Rather, any such apprehension allegedly based on the 2004 double hearsay would only indicate that Alien has just the type of "nervous mind" that cannot form grounds for a reasonable apprehension of suit. *See Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053 (Fed. Cir. 1995) ("more than the nervous state of mind" required). Significantly, Alien's employees' comments in the emails attached to the Vega Declaration demonstrate that Alien did not even believe the statement when it was allegedly made. *See* Emails Between Justin Jose and Victor Vega, attached to Vega Decl. as Exhibit A. Specifically, Mr. Vega, apparently skeptical himself and acting at the behest of others at Alien, pressed the potential customer for more details, including information about when the statement was actually made, what was actually said, and what the position was of the person who said it. *Id.* The potential customer responded and refused to provide any additional detail. *Id.* In the final email, Mr. Drzaic – a Vice President at Alien – was clearly skeptical of this hearsay and referred to the hearsay as "Intermec's alleged threats." *Id.* Tellingly, Alien apparently never considered the incident a basis for a declaratory judgment action in 2004 or 2005. And, there is no evidence that this two-year-old double hearsay statement was actually considered by Alien in deciding whether or not to sue in June of 2006. Since it was not set out in either the Complaint or the Amended Complaint, one can only conclude that this was something that Alien's lawyers learned of only after the suit was filed, and have included here as part of an effort to invent subject matter jurisdiction where none existed on the date the Complaint was filed.

Fourth, and surely something that both could not have factored into Alien's pre-suit thinking and is certainly a result of after-the-fact work by Alien's lawyers, is the claim that several articles in a Korean-language technology publication form a basis for subject matter jurisdiction.  Alien claims that these articles prove that it is Intermec's stated intent to sue all infringers and that this alleged fact supports Alien's purported apprehension of suit.  This is nonsense.  As an initial point, none of the Korean articles Alien presented to this Court contain a single statement either accusing Alien, or anyone else, of infringement or of voicing an intent to sue anyone.  There also is no evidence that these articles were ever read by anyone at Alien, before or after suit was filed.  There is only evidence that they were read by Alien's attorney who obtained them, presumably from the Internet, on October 5, 2006.  *See* Declaration of Megan LaBelle at ¶ 14.  How can an article in Korean and addressing the Korean market, that doesn't contain a threat to sue anyone, have created in Alien an apprehension of an impending lawsuit (let alone an objectively reasonable one) when Alien does not even claim to have read the articles?  The articles refer to the Korean market and Korean patents and not to the U.S. market or any U.S. patents.  The Korean market and Korean patents are not at issue in this case.  Alien is a U.S. manufacturer, not a Korean one, and the only patents-in-suit in this case are U.S. patents.  Further, these articles are inadmissible because they are and contain hearsay and are completely irrelevant to Alien's purported apprehension of suit.

Fifth, Alien takes the position that two letters sent to Alien in mid-2005 in relation to the possible start of a discussion about licensing gave Alien an objectively reasonable apprehension of suit in mid-2006.  However, it is well settled that a patentee's offer of a license, without more, is insufficient to establish the predicate for declaratory judgment jurisdiction.  *Phillips Plastics Corp.,* 57 F.3d at 1053; *Indium Corp.,* 781 F.2d at 883, *cert. denied,* 479 U.S. 820 (1986).

Intermec's two letters do not make any accusation of infringement, they do not refer specifically to any Alien product, nor do they implicate legal action at all. In fact, in the May 9, 2005 letter, Intermec went as far as to assure Alien that, even after the close of the licensing program discussed in the letters, Intermec would "continue to make available [its] standard ISO based RAND (Reasonable and Non Discriminatory) licensing program for all manufacturers who are interested and qualify."

This limited and apparently one-sided communication evidenced by the two letters is nothing like the communications that occurred in the cases relied upon by Alien, where certain types of communications or a cessation of negotiations was held to give rise to an objectively reasonable apprehension of suit. *See EMC v. Norand Corp.*, 89 F.3d 807, 812 (Fed. Cir. 1996) (defendant stated directly to plaintiff that it was inclined to 'turn the matter over to' [its] litigation counsel 'for action,' and urged a 'preliminary business discussion'"); *Duratech Indus. Int'l, Inc. v. Bridgeview Mfg., Inc.*, Case No. 3:05-CV-90-RSW (D.N.D. Apr. 21, 2006) (parties had two face-to-face meetings and four phone calls, defendant asked plaintiff to stop production of the infringing product and expressly discussed the "mounting liability if Duratech kept manufacturing the BaleBuster without a license," and the parties' negotiations broke down after defendant requested a $3.5 million license and plaintiff offered $100,000); *Ivoclar Vivadent, Inc. v. Hasel & ABCO Research LLC*, No. 02cv0316, 2003 WL 21730520 (W.D.N.Y. June 30, 2003) (offer of license expressly advised plaintiff "under 35 U.S.C. § 287 that [its products] infringe one or more claims of [Defendant's] U.S. Patent Nos. 5,547,379 and 5,944,527"). The two one-sided licensing communications in this case bear no resemblance to the facts of Alien's cited cases. The purported license negotiation could not have broken down because it never got under way. All that occurred was that Intermec, on two occasions, offered Alien an opportunity to talk

13

to Intermec about joining a licensing program.   No correspondence or statement by Alien apparently ever expressly rejected Intermec's offers to talk and Intermec never expressly told Alien that it could not apply for a license from Intermec at any time in the future. Of course, neither of these communications accused Alien of infringement or threatened suit.

Finally, Alien posits that Intermec's filing of a suit against Alien over a month after Alien filed this suit could give rise to an objectively reasonable apprehension of suit.  Intermec's suit, filed nearly one month after Alien initially filed its declaratory judgment complaint, could not possibly serve as any basis for Alien's purported objectively reasonable apprehension of suit on the day it filed its Complaint. It is hornbook law that a declaratory judgment plaintiff's apprehension of suit must derive from events that occur before suit is filed.  *West Interactive*, 972 F.2d at 1297 (holding that "because this court examines [plaintiff's] declaratory judgment action at the time of its filing, [defendant's] subsequent action is irrelevant"); *see also Arrowhead Indus. Water, Inc.*, 846 F.2d at 734 n. 2 (refusing to consider post-filing occurrences).

## B.   THE INTERMEC DEFENDANTS' CONTACTS WITH NORTH DAKOTA ARE INSUFFICIENT TO SUBJECT THEM TO PERSONAL JURISDICTION THERE.

Alien concedes that Intermec (a holding company) and IIP (the owner of the patents and a necessary party) have no cognizable contacts with North Dakota and are not subject, under any traditional analysis, to personal jurisdiction there.  Moreover, Alien concedes that no Intermec Defendant has sold any product in North Dakota that reads on any of the claims of the patents-in-suit in this matter.  Faced with this lack of any real link between IIP, Intermec, and the patents-in-suit on one hand and North Dakota on the other, Alien resorts to two strained theories in an effort to find personal jurisdiction.  Specifically, Alien attempts to convince this court that it should ignore all the corporate formalities observed by the Intermec Defendants and decide that it can exercise personal jurisdiction over Intermec and IIP based on the very limited contacts

14

with this jurisdiction of an affiliated company, ITC.  Accordingly, Alien attempts to persuade this Court that ITC's activities in North Dakota – limited though they are – are adequate to bring that company before this Court, thus ensnaring not only itself in this litigation, but also affiliated companies that have no contacts with the state.  Both of these arguments fail based on the law and the facts of this case.

1.   **ALIEN CANNOT IGNORE CORPORATE FORMALITIES IN ITS EFFORT TO CONVINCE THIS COURT TO EXERCISE PERSONAL JURISDICTION OVER INTERMEC AND IIP.**

IIP is the sole owner of the patents-in-suit in this case.  It does no business in North Dakota, has not licensed any North Dakota-based corporation to practice the patents-in-suit and does not have an exclusive licensing arrangement with ITC which would permit this Court to ignore the corporate formalities and subject IIP to personal jurisdiction here.

Other than the limited holding of the *Dainippon* case – which, as discussed below, is inapplicable here – Alien does not present any law supporting its proposition that a parent company's activities in a forum can be imputed to its subsidiary companies where corporate formalities are observed.  In fact, the law supports just the opposite conclusion – a parent company's acts in a forum will not be imputed to its separately-operated subsidiary.  *See Walker v. Newgent*, 583 F.2d 163, 167-68 (5th Cir. 1978), *citing Canon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925) ("[a] subsidiary corporation will not be regarded as the alter ego of its parent because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of control that stock ownership gives to stockholders").

This is not a case like *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, where the court determined that a patent-holding subsidiary could not avoid personal jurisdiction in its parent company's state of incorporation when the parent company made a threat to sue for patent infringement in the forum state.  142 F.3d 1266, 1271.  Initially, it is crucial to note that

*Dainippon* is a specific personal jurisdiction case. *Id.* at 1270-71. There is no discussion of whether the defendants could be subject to general personal jurisdiction, and the analysis in that case focused on whether threats made by the parent in California could result in the exercise of specific jurisdiction in California over its patent-owning subsidiary, who was incorporated elsewhere. *Id.* The court noted defendant's *chutzpah* in attempting to create a situation where it could "threaten its competitors with infringement without fear of being a declaratory judgment defendant [even in its state of incorporation], save perhaps in the state of incorporation of the [patent-]holding company." *Id.* at 1271.

That is not the situation here. The Intermec Defendants are challenging personal jurisdiction in North Dakota, not Washington (the principal place of business for Intermec and ITC and the location of the Intermec Defendants' statements upon which Alien based its purported objectively reasonable apprehension of suit), Nevada (the principal place of business for IIP), Delaware (where Intermec, IIP, and Alien are incorporated), or California (Alien's principal place of business). There also is no question that, unlike the *Dainippon* case, this is not a specific jurisdiction case – Alien admits as much – and IIP's parent company is not trying to avoid jurisdiction in its state of incorporation.

Further, the ruling in the *Dainippon* case also turned on the fact that defendants were trying to avoid jurisdiction in a state where "the parent company operated under the patent [in suit]." *Id.*. at 1271. There is no dispute that ITC does not manufacture anything in North Dakota, including RFID equipment that might embody the patents in suit. Nor is their any question that ITC has never sold any RFID equipment to anyone in North Dakota.

Nor can Alien impute ITC's scant contacts with North Dakota to Intermec, Inc. *See Canon*, 267 U.S. at 337 (refusing to impute contacts on parent where the "corporate separation,

though perhaps merely formal, was real.  It was not pure fiction."); *see also Epps v. Stewart Info. Svcs. Corp.*, 327 F.3d 642 (8th Cir. 2003) ("a corporation is not doing business in a state merely by the presence of its wholly owned subsidiary"); *Steinke v. Safeco Ins. Co.*, 270 F. Supp. 2d 1196 (D. Mont. 2003) (finding lack of personal jurisdiction where parent company had no officers, offices, or business in Montana and the parent company and its wholly-owned subsidiary maintained their formal separateness).

Intermec, ITC, and IIP all consistently recognize their formal separateness and all corporate formalities.  Each corporation has separate officers and directors.  Though there is some overlap in officers, it is minimal.  Only one person holds an office in all three companies (and he is not the CEO of any of them) and no individual serves as a director for more than one of the companies.[3]  *See* Declaration of Megan LaBelle ("LaBelle Decl.") at Exhibit D.  IIP maintains in Nevada a completely separate principal place of business.  Declaration of Ken Cohen ("Cohen Decl.") at ¶ 15.  All of the companies maintain their own by-laws and corporate governance.  *See* By-Laws for Intermec, ITC and IIP, attached to Kramer Decl. as Group Ex. B.  And, IIP licenses its patents to many non-affiliated companies, including ITC.  *See* Excerpted Transcript of the 30(b)(6) Deposition of Kenneth Cohen, attached to Kramer Decl. as Ex.C, at p. 59-60.  Each company also has its own bank accounts.  *Id.* at p. 40.  There is simply no evidence in the record that the Intermec Defendants fail to recognize their separateness and all corporate formalities.  In the absence of such evidence, there is no basis for imputing ITC's extremely limited  contacts with North Dakota to Intermec or IIP.

---

[3] Alien references what it calls the Intermec Defendants' "confusion" over the officers of its companies.  Alien Opp. at 24.  This is nothing more than a case of a typo that was carried over from the Thomson Financial transcription of Intermec's May 8, 2006 conference call.  In that transcript, Thomson incorrectly identified Mr. Winter as President and COO of Intermec, Inc.  The Intermec Defendants are not confused and, in their factual background, they correctly identified Mr. Winter as the Senior Vice President of Intermec.  This statement merely highlights that Alien is grasping at straws to support its argument and attempting to seek a ruling of this Court based on a typo.

2.   **EVEN ASSUMING THIS COURT IMPUTES ITC'S CONTACT WITH THIS FORUM TO INTERMEC AND IIP, THOSE CONTACTS ARE INADEQUATE TO ALLOW THE EXERCISE OF PERSONAL JURISDICTION OVER ANY OF THE INTERMEC DEFENDANTS.**

In the absence of personal jurisdiction over IIP, there is no reason for this case to proceed, as ITC does not own the patents-at-issue. Should this Court, however, choose to accept that it is possible to extend personal jurisdiction to IIP based on ITC's activities in North Dakota, there are only three factual issues relevant to this Court's determination of personal jurisdiction over ITC: (1) ITC's direct sales to companies in North Dakota; (2) ITC's Certificate of Good Standing in North Dakota;[4] and (3) ITC's travel to North Dakota. The remaining issues raised by Alien are nothing more than red herrings aimed at portraying ITC's contacts with North Dakota as greater than they actually are. *See infra* at §§ B.2.a. and b. Taking into account the entirety of the relevant contacts, ITC's contacts with the State of North Dakota are, at most, random, sporadic, and attenuated, and cannot form a basis for this Court to exercise personal jurisdiction over any of the Intermec Defendants.

Both parties agree, that personal jurisdiction is only proper if ITC's contacts with North Dakota are continuous and systematic enough to justify this Court's exercise of general personal

---

[4] Alien correctly points out that, in his Declaration and at his 30(b)(6) deposition Ken Cohen stated that Intermec did not have license to do business in the State of North Dakota. As Mr. Cohen explains in his Supplemental Declaration, attached to Kramer Decl. at Exhibit D, he has reviewed the documents attached to the Declaration of Sarah H. Herman ("Herman Decl.") as Exhibits A, B, and C, and has determined that his testimony was the result of a misunderstanding. It was Mr. Cohen's understanding that a license to do business was a certificate filed in relation to the filing of an income tax return in the State of North Dakota. He confirmed that none of the Intermec Defendants had filed income tax returns in the State of North Dakota and, therefore, to Mr. Cohen's understanding at the time, there would have been no need to have a license to do business in that State. After reviewing the documents attached to Ms. Herman's declaration – documents which were not produced to the Intermec Defendants or presented to Mr. Cohen at his deposition – he has been able to review the Intermec Defendants' corporate records and determine that ITC, and only ITC, has obtained a Certificate of Good Standing from the Secretary of State of North Dakota and continues to keep that Certification current. Also, upon reviewing Intermec's records and his Declaration, Mr. Cohen noted that ITC has never filed a tax return in North Dakota. Mr. Cohen intended to state that ITC had never filed an income tax return. As is obvious from ITC's invoices, ITC always charges customers for the sales and use tax in the state where the customer is located. ITC collects North Dakota sales taxes and, on a quarterly basis, files sales and use tax returns and provides to the State of North Dakota sales taxes that have been collected. Additionally, in order to keep ITC's Certificate of Good Standing in North Dakota current, ITC files Annual Reports.

jurisdiction.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (defendant must purposefully avail itself of the privilege of conducting activities in the forums state); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980).  ITC's contacts are not sufficient to meet that test.

Initially, ITC's sales in North Dakota cannot establish a basis for personal jurisdiction.  In the period from January 1, 2001 through December 31, 2005, ITC's annual sales to customers located in North Dakota averaged $257,635.18 per year.[5]  In 2005, the year in which ITC had the most sales to the State of North Dakota, ITC had only $241,315.77 of revenue from sales to entities in North Dakota.  Even in that largest year of sales, ITC's sales to customers in North Dakota totaled a paltry 0.0506% of domestic sales.[6]  That is a miniscule portion of ITC's sales and does not provide adequate minimum contacts to justify this Court's exercise of personal jurisdiction over ITC.

Court's cannot exercise personal jurisdiction over a defendant in a situation like this, where sales to a forum are small and represent a minimal percentage of a party's total sales. *Ensign v. Bank of Baker*, 676 N.W.2d 786, 791-92 (N.D. 2004); *Stairmaster Sports/Medical Prods., Inc. v. Pacific Fitness Corp.*, 916 F. Supp. 1049, 1053 (W.D. Wash. 1994), *aff'd* 78 F.3d 602 (Fed. Cir. 1996);[7] *McGill Tech. Ltd. v. Gourmet Tech., Inc., et al.*, 300 F. Supp. 2d 501, 508

---

[5] Specifically, ITC's sales in North Dakota for each year were as follows: 2001 - $304,173.60; 2002 - $285,980.79 2003 - $234,228.19; 2004 - $222,477.57; 2005 - $241,315.77; and through August 1, 2006 - $39,505.93.  *See* Kramer Decl., ¶¶ 10-11, Group Exhibit E.

[6] For each year since 2001, ITC's sales in North Dakota have represented the following percentages of total domestic sales: 2001 - .0798 %; 2002 - .0770 %; 2003 - .0626%; 2004 - .0533%; and 2005 - .0506%.  *See* Declaration of David Maxwell, attached to Kramer Decl. at Ex. G; Kramer Decl. at Exs. E through F.

[7] Alien attempts to distinguish *Stairmaster Sports/Medical Prods., Inc.*, 916 F. Supp. at 1053 (W.D. Wash. 1994) by stating that, in that case, personal jurisdiction was not based on "direct sales into the forum state." Alien's Opp. at p. 21 n. 13.  That distinction is absurd and in direct opposition to Alien's own argument that ITC could be found subject to personal jurisdiction in this forum based on sales of independent third-party resellers.

(E.D. Mich. 2004), *citing Hockerson-Halberstadt, Inc. v. Propet USA, Inc.*, 62 Fed. Appx. 322 (Fed. Cir. 2003). Though Alien argues that the constitutional test for personal jurisdiction would change based on the population of the forum, no case stands for that proposition. Alien Opp. at 19-20. More strikingly, Alien's citation to *3M Innovative Properties Co. v. InFocus Corp.*, No.Civ.04-0009 JNE/JGL, 2005 WL 361494 (D. Minn. Feb. 9, 2005) blatantly mischaracterizes that case. That case involved an out-of-state defendants with $3.8 million in revenue in a single year and $20 million in revenue over the previous five years – significantly higher than ITC's sales here. *Id.* at *3. In that case, the percentage of defendant's revenue represented by sales in the forum was more than ten times greater than here. *Id.* Importantly that case makes no mention of the proposition for which Alien cites it – that the size of the forum has any relevance to the substantial nature of the contact. *Id.* That is because the law does not support a sliding scale approach based on the population of the forum.

ITC's Certificate of Good Standing does nothing to establish personal jurisdiction in North Dakota. While a license to do business is often mentioned in the caselaw, none of the cases cited by Alien suggest that personal jurisdiction can based on such a license. The opposite is true. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996) (does not even mention a license to do business in the forum state while acknowledging the general rule that a "mere license to do business and designation of agent for service of process within the forum state [is] insufficient to confer general jurisdiction); *Korzyk v. Swank Enterprises, Inc.*, No CV-04-343-AAM, 2005 WL 1378758 (E.D. Wash. June 9, 2005) (relying on business done in state, not merely defendant's license to do business in forum). A license to do business signifies nothing more than the fact that ITC has some sales in North Dakota. What matters for purposes

of personal jurisdiction is whether those sales are sufficient to provide the minimum contacts necessary for personal jurisdiction. As discussed above, those sales are not enough.

Finally, Alien argues that personal jurisdiction can be established based on ITC's employees' visits to North Dakota. Alien's reticence to actually quantify the visits by ITC employees to North Dakota reveals the weakness of this evidence. Over the course of five years, from January 1, 2001 through August 1, 2006, a total of 9 ITC employees (out of a workforce of 2,600) traveled to North Dakota. *See* LaBelle Decl.¶ 8. At least 5 of those employees all traveled to North Dakota on a single project for a single customer and at least 2 of those employees traveled to North Dakota on another project. *See* Excerpted 30(b)(6) Deposition of Larry Comparone at 65-93, attached to Kramer Decl. as Ex. H; Excerpted 30(b)(6) Deposition of Jeffrey Johnson at 24, attached to Kramer Decl. at Ex. I. Such limited travel to the state; travel which is related to a minute portion of ITC's revenue for the time period can not reasonably subject ITC to personal jurisdiction in North Dakota. Moreover, ITC has never had an office in North Dakota nor has any ITC employee ever resided there. Cohen Decl. at ¶25.

> **a.** **Sales by independent resellers cannot be a basis for personal jurisdiction over ITC.**

Contrary to Alien's argument, Federal Courts do not routinely permit the exercise of personal jurisdiction over a manufacturer based on independent re-sellers' and/or distributors' activities in the forum. *See Jennings v. AC Hydraulic A/S,* 383 F.3d 546, 551 (7th Cir. 2004) (mere fact that defendant sold products to a distributor could not provide a basis for personal jurisdiction where defendant did not control distributor); *Bridgeport Music, Inc. v. Still N The Water Pub.,* 327 F.2d 472, 480 (6th Cir. 2003) (knowledge that product might be distributed nationally by third-party insufficient to predicate purposeful availment); *Boit v. Gar-Tec Prod., Inc.,* 967 F.2d 671, 682 (1st Cir. 1992) (test is not knowledge of ultimate destination of the

product, but whether manufacturer has purposefully engaged in forum activities); *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 376 (8th Cir. 1990) (mere unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum state).

Thus, the issue of whether any re-seller has sold products in North Dakota is irrelevant to personal jurisdiction here.[8]   ITC does not dispute that it sells its product to resellers throughout the country. ITC does not, however, exercise any control over those resellers. Declaration of Chris Horne at ¶ 4, attached to Kramer Decl. at Ex. J. It does not own any of its re-sellers and none of its re-sellers exclusively sell Intermec products. *Id.* ITC does not limit the geographic range of any re-seller, nor does it designate a specific region where any of its resellers operate. *Id.* Thus, no reseller has been expressly directed to sell in ND. *Id.* Contrary to Alien's unfounded assertions, ITC's sales to its resellers and distributors are arms-length transactions and the resellers and distributors are free to sell those products anywhere they choose. *Id.* at ¶¶ 4-5.

---

[8] In a footnote, Alien presses its argument that ITC can be subject to personal jurisdiction in North Dakota based on the act of third parties. Alien Opp. at p. 20 n. 12. First, Alien suggests that simply because some of ITC's customers are large national chains such as Home Depot, Walmart, and PepsiCo, ITC can be hailed into court in North Dakota if any of these companies happen to use ITC products in their stores in North Dakota, even though ITC neither sold the product to a North Dakota based company or delivered it to North Dakota. *Id.* Next, Alien contends that the presence of an ITC product in use at a Home Depot store in Fargo can serve as a basis for the exercise of general personal jurisdiction. *Id., citing* Declaration of Glenn Gengel. Both of these arguments are meritless – as Alien so much as admits by presenting them solely in a footnote. Just as is the case with resellers and distributors, ITC cannot be drawn into a jurisdiction with which it does not have the requisite minimum contacts to justify the exercise of personal jurisdiction based on the actions of customers. *See infra* at § B.2.a. Moreover, this argument seek to confuse the distinction between specific and general personal jurisdiction in the manner which the Supreme Court expressly rejected in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 312 (1980) ("the fortuitous circumstance that a single [product of defendant] happened" to be present in the forum does not provide a basis for personal jurisdiction). The mere presence of ITC's product in a store in North Dakota does not indicate any purposeful availment by ITC of the jurisdiction, nor does it indicate any intent to be present there. *Id.* Thus, it provides no basis for the exercise of jurisdiction.

Alien alludes to a vast unknown number of sales to North Dakota by ITC's resellers as a basis for personal jurisdiction in North Dakota. As discussed above, sales by resellers are irrelevant to the question of personal jurisdiction. To the extent this Court considers those sales, however, no such unknown sales exist. Rather, all of ITC's sales are represented by sales through three channels: 1) direct sales; 2) direct resellers; and 3) stocking distributors (also referred to as two-tier resellers). Horne Decl. at ¶ 3. The invoices produced in this matter reflect all direct sales to North Dakota and nearly all sales by direct resellers. *Id.* This is because direct resellers nearly always have their customers' orders "drop-shipped." *Id.* In this regard, direct resellers generally contact ITC and order product to be shipped directly to their customers. *Id.* These sales to the non-North Dakota resellers are generally recorded on invoices that have a bill-to address outside of North Dakota, but a ship-to address in North Dakota. *Id.* Finally, all sales by ITC's six (6) two-tier resellers are reported back to ITC indicating the zip code of the end user who purchased the product.[9] Thus, ITC has accounted for nearly all products that may have reached end-users in North Dakota for the period from January 1, 2001 through August 1, 2006, even if ITC did not sell the product to someone in North Dakota.

Even assuming there were a basis for this Court to consider any reseller's sales, the addition of those sales to ITC's total sales revenue in North Dakota does not change the fact that ITC lack contacts with North Dakota sufficient to establish personal jurisdiction. Including

---

[9] At the 30(b)(6) deposition of Larry Comparone, Mr. Comparone indicated that ITC may track the location of the end-users for sales of some of its resellers. Comparone Dep. at 35-37. While Alien did not request that ITC obtain this report and provide it to Alien, ITC has obtained a report of all sales by ITC's two-tier resellers to addresses in North Dakota. The report containing that information is attached as Exhibit A to the Declaration of Chris Horne which is attached to the Kramer Decl. at Exhibit J. The report indicates that for the entire period from January 1, 2001 to present, ITC's two-tiered reseller have only sold $171,709.11 worth of products and services to end-users in North Dakota. Thus, aside from a minute fraction of direct reseller sales, ITC has tracked all of its products that reached end-users in North Dakota for the period from January 1, 2001 through August 1, 2006 and the total is $342,011.84 for 2001, $325,946.10 for 2002, $332,348.00 for 2003, $431,136.98 for 2004, $501,086.04 for 2005, and $297,124.11 for the period from January 1, 2006 through August 1, 2006. *See id*; Kramer Decl. at Ex. E and F; Maxwell Decl. at Ex. A.

reseller sales to North Dakota, the combination of resellers' sales and ITC's sales to customers in North Dakota during the period from January 1, 2001 through December 31, 2005 averages approximately $386,505.79 per year. That represents .0956% of ITC's domestic sales. Taking into account both the amount of revenue from North Dakota customers and the percent of ITC's revenue that such revenue amounts to, this is still an insufficient amount of sales to justify the exercise of personal jurisdiction. *Ensign*, 676 N.W.2d at 791-92; *Stairmaster*, 916 F. Supp. at 1053; *McGill*, 300 F. Supp. 2d at 508.

**b.   ITC's Former Relationship with Microsoft Business Solutions is Irrelevant.**

Alien's self-perceived ace-in-the-hole argument is that ITC can be subject to general personal jurisdiction in North Dakota because it formerly maintained a business relationship with Microsoft Business Solutions ("MBS"), a Minnesota Corporation that is a subsidiary of Microsoft of Redmond, Washington. Legally, this relationship has no bearing on the issue of general jurisdiction. Alien cites one case to support its position – *Black & Veatch Const., Inc. v. ABB Generation, Inc.*, 123 F. Supp. 2d 569, 576 (D. Kan 2000). That case is completely inapposite. *Black & Veatch* is a specific jurisdiction case. It found that a party to a consortium agreement was subject to specific personal jurisdiction because the case arose out of a claim for breach of that same agreement. In fact, the Court in that case noted that "[e]stablishing a contractual relationship with a resident of Kansas does not itself, however, establish minimum contacts with Kansas." *Id.* at 574.

Further, when the facts about the MBS relationship are examined, it is clear that the relationship does not provide any additional contacts with North Dakota sufficient to establish personal jurisdiction over ITC. MBS, which does have some operations in Fargo, North Dakota,

did almost nothing with regard to the relationship. Johnson Dep. at 80. ITC designed a product that was intended to be used with MBS's product. *Id.* at 83-4. The product was called EasyADC and it was designed by Intermec in cooperation with an Ann Arbor, Michigan-based company who had been a "partner" of ITC before ITC ever had contact with MBS. *Id.* Once the product was designed, the only contact person from Microsoft that ITC worked with was a marketing representative located in Florida. *Id.* at 83. MBS's North Dakota-based employees provided absolutely no support for the product and ITC ultimately sold a total of 9 units of the EasyADC product. *Id.* None of the products were sold to anyone in North Dakota. *Id.* Due to lackluster performance and the lack of support from MBS, the product offering was discontinued by early 2006 and the relationship with MBS ended before this suit was brought. *Id.* at 15. In the end, there almost was no relationship between ITC and MBS and certainly not enough of a relationship to provide a basis for general personal jurisdiction in North Dakota.

C.   **SINCE ALIEN'S COMPLAINT FAILED TO IDENTIFY SPECIFIC PRODUCTS THAT ALIEN BELIEVES ARE ACCUSED OF HAVING INFRINGED IIP'S PATENTS, ALIEN'S COMPLAINT MUST BE DISMISSED PURSUANT TO RULE 8(A).**

The Intermec Defendants rely on their argument, set forth in their Memorandum in Support of Their Motion to Dismiss, that Alien's Amended Complaint should be dismissed for failure to comply with Fed.R.Civ.P. 8. Alien's request to replead in the event this Court agrees that the Complaint is defective should be denied on the grounds that this Court does not have subject matter jurisdiction or personal jurisdiction over the Intermec Defendants.

## CONCLUSION

For the foregoing reasons, Intermec, Inc., Intermec Technologies Corp., and Intermec IP Corp., respectfully request that this Court grant the Intermec Defendants' Motion to Dismiss.

Dated: October 20, 2006        Respectfully Submitted,

INTERMEC, INC., INTERMEC TECHNOLOGIES
CORP., and INTERMEC IP CORP,


By:    /s/ Ronald H. McLean        
        One of Its Attorneys

Ronald H. McLean
Jane L. Dynes
SERKLAND LAW FIRM
10 Roberts Street
P.O. Box 6017
Fargo, ND  58108-6107
(701) 232-8957 phone
(701) 237-4049 fax
and

Carson P. Veach
Leland W. Hutchinson, Jr.
David S. Becker
Jacob D. Koering
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois  60606
(312) 360-6000 phone
(312) 360-6595 fax